UNITED STATES of America, Appellee,

v.

Rainford T. THOMPSON, Defendant–Appellant.

No. 1322, Docket 93–1741.

United States Court of Appeals, Second Circuit.

Argued April 28, 1994.

Decided Sept. 15, 1994.

---

Jonathan W. Feldman, Rochester, NY, for defendant-appellant.

Bradley E. Tyler, Asst. U.S. Atty., Rochester, NY (Patrick H. NeMoyer, U.S. Atty. for the W.D. of N.Y., of counsel), for appellee.

Before: LUMBARD, VAN GRAAFEILAND and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Rainford T. Thompson appeals from Chief Judge Telesca's denial of a pre-trial motion to suppress certain statements made to the Immigration and Naturalization Service ("INS"), which provided the factual basis for an information charging a violation of 18 U.S.C. § 911, 821 F.Supp. 110. Pursuant to a plea agreement that preserved his right to appeal the denial of his motion to suppress, Thompson pleaded guilty to the information. On appeal, he argues that the statements were obtained in violation of the Fourth and Fifth Amendments and an ethical duty derived from DR 7–104(A)(1) of the New York Code of Professional Responsibility. We disagree and affirm.

## BACKGROUND

Thompson was arrested for possession and sale of a controlled substance by an undercover agent of the Monroe County Drug Task Force on February 18, 1989, outside an apartment building at 132 South Union Street in Rochester, New York. Immediately after the arrest, members of the Monroe County Drug Task Force conducted a warrantless search of an apartment at that address. The government concedes that this search was illegal.

While the apartment was being searched, INS Special Agent McLaughlin, who was at the scene of arrest, asked Thompson for his name and place of birth. Thompson responded that he was born in the Virgin Islands and was a United States citizen. After this exchange, Agent McLaughlin learned that the search had yielded a wallet containing a Virgin Islands birth certificate in the name of Rainford Thompson.

A few days after the search, Agent McLaughlin directed INS Special Agent Peter Hoelter to investigate Thompson's claim of United States citizenship. He advised Agent Hoelter that he did not believe Thompson's assertion that he was born in the Virgin Islands and questioned the validity of the birth certificate that had been found during the search. He also instructed Agent Hoelter to obtain a copy of the birth certificate, which was then at the Monroe County Jail.

On March 10, 1989, attorney Fred S. Gallina filed a Form G–28, entitled "Notice of Entry of Appearance as Attorney or Representative," which enabled Gallina to obtain Thompson's records from the INS. Agent Hoelter contacted Gallina by telephone on March 15. Gallina has stated in an affidavit that he does not recall Agent Hoelter requesting permission to speak with Thompson at the Monroe County Jail without Gallina present. However, Agent Hoelter's notes from the telephone conversation state that "Mr. Gallina was advised that [Thompson] needed to be interviewed by [the] INS to determine his status in U.S." The notes also indicate that Gallina was informed that the INS wanted to obtain a copy of the seized birth certificate. There is no indication in Gallina's affidavit or Agent Hoelter's notes that Gallina told Hoelter that he could not interview Thompson.

That same day, after the telephone conversation with Gallina, Agent Hoelter interviewed Thompson in the Monroe County Jail. At the inception of the interview, Agent Hoelter identified himself and stated that he needed to establish Thompson's status as a resident of the United States. Thompson responded by stating that he was a citizen of the United States. Agent Hoelter then informed Thompson of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966). Thompson indicated that he understood his rights, and he signed a waiver.

Agent Hoelter proceeded to ask Thompson a series of questions concerning his claim of United States citizenship. Thompson reiterated that he had been born in the Virgin Islands and had a Virgin Islands birth certificate. He also signed a consent request authorizing Agent Hoelter to obtain a photocopy of the birth certificate from Thompson's personal property held at the Monroe County Jail. Agent Hoelter then asked Thompson to sign a sworn statement of the information he had given Agent Hoelter. Thompson declined and stated that he did not want to answer any questions without an attorney. Agent Hoelter then terminated the interview.

Agent Hoelter examined and photocopied the birth certificate. Upon an inquiry to the Virgin Islands Office of Vital Statistics, he discovered that the Virgin Islands had no record of Thompson's birth. Through further investigation, Agent Hoelter determined that Thompson was born in Jamaica and had been issued a passport by the Jamaican government.

Thompson was then charged in an information with falsely claiming to be a United States citizen, in violation of 18 U.S.C. § 911. According to the information, these false claims occurred when Thompson was interviewed by Agent McLaughlin on February 18, 1989, and when he was interviewed by Agent Hoelter in the Monroe County Jail on March 15, 1989.

Thompson then moved pursuant to Fed. R.Crim.P. 41(e) to suppress the birth certificate, the statements made to Agent McLaughlin, and the statements made to Agent Hoelter. After a hearing and Recommendation and Report from Magistrate Judge Kenneth R. Fisher, the district court ordered suppression of items seized from the apartment, including the birth certificate and the statements made to Agent McLaughlin. It denied Thompson's motion to suppress the March 15, 1989 statements to Agent Hoelter. Thompson then waived indictment and entered into a plea agreement conditioned upon his right to appeal the partial denial of his suppression motion. *See* Fed.R.Crim.P. 11(a)(2). The district court sentenced Thompson to unsupervised probation for a term of three years.

## DISCUSSION

■ Thompson argues that his statements to Agent Hoelter were obtained in violation of his Fifth Amendment right to counsel and in violation of an ethical duty derived from DR 7–104(A)(1) of the New York Code of Professional Responsibility. He argues also that the statements must be suppressed under the Fourth Amendment, as the fruit of a warrantless search. We review *de novo* the district court's conclusions as to whether Thompson's constitutional rights were violated and for clear error its findings of fact. *United States v. Osorio,* 949 F.2d 38, 40 (2d Cir.1991).

### 1. *Fifth Amendment Right to Counsel*

■ In *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), the Supreme Court held that police must terminate an interrogation of an accused in custody if the accused requests assistance of counsel. Once the right to counsel is invoked, an accused may not be interrogated about any offense until counsel is present, unless the accused thereafter indicates waiver by initiating further communication with the police (or in this instance, the INS). *See Minnick v. Mississippi,* 498 U.S. 146, 149–156, 111 S.Ct. 486, 488–493, 112 L.Ed.2d 489 (1990); *Arizona v. Roberson,* 486 U.S. 675, 677–78, 108 S.Ct. 2093, 2095–96, 100 L.Ed.2d 704 (1988); *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). If further interrogation is initiated by the investigative authority, "the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991).

■ Thompson argues that the filing of INS Form G–28 was an invocation of his right not to respond to custodial interrogation outside the presence of counsel, and that Agent Hoelter's March 15, 1989 interrogation

therefore violated the Fifth Amendment. We disagree.

A statement that a person wishes to use counsel for one specific purpose does not necessarily indicate an intent to invoke the Fifth Amendment *Miranda* guarantee. *See McNeil,* 501 U.S. at 177–82, 111 S.Ct. at 2208–11 (invocation of Sixth Amendment right to counsel in adversarial criminal proceeding is not an invocation of Fifth Amendment right to counsel in an unrelated offense). "The purpose of the *Miranda–Edwards* guarantee ...—and hence the purpose of invoking it—is to protect ... the suspect's desire to deal with the police only through counsel." *Id.* 501 U.S. at 178, 111 S.Ct. at 2209 (internal quotation omitted). An invocation of the Fifth Amendment right to counsel "requires, at a minimum, some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*" *Id.* The Form G–28 signed by Thompson contains no such statement. By signing the form, Thompson consented only to "THE DISCLOSURE TO [Gallina] OF ANY RECORD PERTAINING TO ME WHICH APPEARS IN ANY IMMIGRATION AND NATURALIZATION SERVICE SYSTEM OF RECORDS." The form · nowhere requests the assistance of counsel for purposes of a custodial interrogation.

Thompson's reliance upon *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2568–69, 61 L.Ed.2d 197 (1979), for the proposition that *any* request for counsel constitutes an invocation of the Fifth Amendment takes that decision out of context. *Fare* does state that *Miranda* provides "the rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment· rights, requiring that all interrogation cease." *Id.* However, the restatement of *Miranda* in *Fare* referred only to an actual request for an attorney made in the context of custodial interrogation. *Id.* at 717–19, 99 S.Ct. at 2567–69. In contrast, Thompson's filing of

the Form G–28 did not occur in the context of custodial interrogation.

### 2. *DR 7–104(A)(1)*

■ Thompson argues that DR 7–104(A)(1) of the New York Code of Professional Responsibility, or an analogy thereto, mandates suppression of his statements to Agent Hoelter. DR 7–104(A)(1) provides:

> During the course of the representation of a client a lawyer shall not ... [c]ommunicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.

N.Y. Code of Professional Responsibility DR 7–104(A)(1) (McKinney 1992).

In *United States v. Hammad,* 858 F.2d 834, 840 (2d Cir.1988), *cert. denied,* 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990), we held that a prosecutor violated DR 7–104(A)(1) by employing an informant as an alter ego to elicit admissions from a represented suspect. We further held that in future cases, district courts may exercise their discretion to suppress evidence obtained in violation of DR 7–104(A)(1). *Id.* at 840–42.

Thompson concedes that DR 7–104(A)(1) is not directly applicable to Agent Hoelter, because he is not an attorney. He argues, however, that the district court should have suppressed his statements to Agent Hoelter, because the principles contained in DR 7–104(A)(1) should be made applicable to all law enforcement agents. However, *Hammad* does not support the extension of a rule of professional conduct governing attorneys to an agent performing an investigative function. *See Hammad,* 858 F.2d at 839 (finding no violation of DR 7–104(A)(1) if prosecutor merely employs "legitimate investigative techniques in conducting or supervising criminal investigations").[1] The district court

---

1. We assume, for purposes of this opinion, that federal prosecutors are subject to the ethical canons of DR 7–104(A)(1) of the New York Code of Professional Responsibility. However, the Department of Justice has contended, since at least 1989, that federal prosecutors are not bound by state no-contact rules in dealing with represented persons. *See* Memorandum from

therefore properly declined to suppress statements made to Agent Hoelter on the grounds that Agent Hoelter had violated an ethical duty to obtain Gallina's consent to the March 15, 1989 interview.

### 3. *Fourth Amendment Suppression*

█ Thompson argues that his statements to Agent Hoelter should have been suppressed as the fruit of the illegal search of his apartment and seizure of his birth certificate. Although there is some force to this contention, we are ultimately unpersuaded that Thompson's March 15 statements were tainted by the illegal seizure.

In *Wong Sun v. United States*, 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963), the Supreme Court held that verbal evidence indirectly obtained through a Fourth Amendment violation may be excludable as "fruit of the poisonous tree." However, the Court also cautioned:

> We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of primary taint.'

*Id.* at 487–88, 83 S.Ct. at 417–18 (quoting Maguire, *Evidence of Guilt* 221 (1959)).

█ The question of whether a statement has been purged of such a taint does not hinge on a simple "but for" analysis, but rather, "must be answered on the facts of each case." *Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). Relevant factors include whether a *Miranda* warning has been given and waiver obtained, the temporal proximity of the illegal seizure and the contested statement, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Id.* 422 U.S. at 603–04, 95 S.Ct. at 2261–62. The prosecution bears the burden of showing admissibility. *Id.* at 604, 95 S.Ct. at 2262.

There are no pertinent intervening circumstances between the illegal seizure and Thompson's statements. In addition, although the "flagrancy" of the search has not been established, the government's concession of its illegality weighs against it. However, on the facts of this case, we are persuaded that Thompson's statements were not the fruits of the search.

Thompson argues that the interview between Agent Hoelter and Thompson would not have occurred but for the illegally seized birth certificate. There is evidence that Agent Hoelter's visit to Thompson was motivated by a desire to obtain a copy of the birth certificate. However, the Magistrate's finding, adopted by the district court, that inquiry into Thompson's alienage inevitably would have been conducted by the INS irrespective of the illegal seizure, is not clearly erroneous. The inevitability of such an inquiry is evidenced by McLaughlin's questioning of Thompson prior to McLaughlin's knowledge of the Virgin Islands birth certificate. Thus, the birth certificate was a redundant motivation for the inquiry into Thompson's status as a resident of the United States. *Cf. Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have

Dick Thornburgh, Attorney General, to All Justice Department Litigators 7 (June 8, 1989) ("[T]he 'authorized by law' exemption in DR 7-104 applies to all communications with represented individuals by Department attorneys or by others acting at their direction" and the Supremacy Clause precludes application of DR 7-104 by "any disciplinary authority other than the United States."); *see also* Communi-

cations With Represented Persons, 59 Fed.Reg. 39,910, 39,928–31 (1994) (to be codified at 28 C.F.R. pt. 77) (setting forth circumstances under which federal prosecutors may communicate with persons known to be represented by counsel and providing that the rule "shall not be a basis for ... excluding relevant evidence in any proceeding in any court of the United States").

been discovered by lawful means ... then ... the evidence should be received.").

■ Moreover, Thompson's statements to Agent Hoelter were voluntarily made after warning and waiver.[2] We recognize that "Miranda warnings, alone and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the [contested statement]." *Brown,* 422 U.S. at 603, 95 S.Ct. at 2261. However, the issuance of a *Miranda* warning and the signing of a waiver are important indicators of whether a statement has been obtained by exploitation of illegality. *Id.* In addition, almost a month had elapsed between the illegal seizure and Thompson's statements. Furthermore, Thompson does not argue, and there is no evidence, that Agent Hoelter used his knowledge of the seized birth certificate during the interview in order to elicit the false statements from Thompson.

We conclude that the government has demonstrated that Thompson's statements were not tainted by the prior seizure of the birth certificate. The district court therefore properly denied Thompson's motion to suppress.

We affirm.

---

**2.** Agent Hoelter's testimony before Magistrate Fisher indicates that he did not immediately read the *Miranda* warnings to Thompson. However, he did read the warnings after Thompson responded that he was a United States citizen. Thompson's post-warning statements are not barred by the Fifth Amendment. *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 1297–98, 84 L.Ed.2d 222 (1985) (initial failure of law enforcement officers to administer *Miranda* warnings does not taint subsequent admissions made after suspect has been fully advised of and has waived *Miranda* rights).