[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 96-2916
_____

D. C. Docket No. 95-49-CR-J-20

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES ARTHUR GRIMES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(June 8, 1998)

Before ANDERSON and BLACK, Circuit Judges, and HOEVELER[*], Senior
District Judge.

_____

[*]Honorable William M. Hoeveler, Senior U.S. District Judge for
the Southern District of Florida, sitting by designation.

BLACK, Circuit Judge:

On March 18, 1996, a jury convicted Appellant James Arthur Grimes of knowingly and maliciously damaging a building used in or affecting interstate commerce by means of explosive, in violation of 18 U.S.C. § 844(i). The judge sentenced Grimes to life imprisonment. Grimes appeals several issues arising from the investigation that resulted in the charge, his trial, and his sentencing. We hold that the district court did not err by denying Grimes' motion to suppress and that there was no reversible error in Grimes' trial or sentencing procedures. We therefore affirm Grimes' conviction and sentence.

## I. BACKGROUND

Appellant Grimes worked as a maintenance supervisor for Cedar Cove Apartments in Jacksonville, Florida, in the late 1980s. The manager of Cedar Cove, Kathy Todaro, eventually fired Grimes saying that (1) he had been unresponsive to pages; (2) he was operating a business on company time using company materials; and (3) there was a discrepancy in his overtime hours. Grimes stated that he knew many people wanted him out of the company, but suggested that Todaro wanted him out so that the assistant maintenance supervisor could have the job.

After he was fired, Grimes told a friend that he was going to "blow up the bitch" who fired him. He said he could tamper with the boiler in the laundry room

2

and blow up the whole crew. He also suggested there were other ways he could harm the complex.

On March 19, 1990, Sherwin Douglas Finlay observed a package on the floor outside of his apartment (# 101) at Cedar Cove.[1] The package was marked "Ballast." When Finlay picked up the package, it exploded. Finlay suffered severe injuries and died as a result of the blast. The apartment complex also sustained serious damage from the explosion.

As neighbors moved toward the explosion, two of them observed a man with a smirk on his face walking casually away from the scene. The two neighbors later picked Grimes' picture from a photo line-up and identified him in court as the man they saw walk away from the bombing.

Grimes later began to work for Kenneth Pender as a "gofer." When Grimes and Pender encountered difficulty repairing the electrical system at a hunting lodge, Grimes began talking about electrical switches and timers. Grimes described the button on a refrigerator as working "like the button on the steel plate at the bombing at Cedar Cove." Grimes also had crying spells during which he told Pender, "I called,

---

[1] During the time that Grimes was employed by Cedar Cove, apartment 101 was used to store supplies for the maintenance crew.

3

I told the bitch I was going to blow up the place" and "it wasn't meant for the old man. It wasn't even the maintenance man that took my place."

On October 11, 1994, Pender met with an investigator from the state attorney's office and reported that Grimes had divulged many details regarding the Cedar Cove bombing. Pender agreed to cooperate with investigators[2] and to tape future conversations with Grimes.

On December 13, 1994, Grimes was arrested on worthless check charges. The following day, counsel was appointed and Grimes signed a claim of rights form.[3] Copies were placed in the court and jail files and a copy was served on both the state's attorney and the Jacksonville Sheriff's Office (JSO).

While in jail, Grimes told a fellow inmate, "I placed the bomb there, but I didn't intend — the man was an accident. I didn't intend, you know, to hurt nobody, just to be property damage and scare some of the tenants and cause them problems and money." Before his arrest, Grimes talked about Cedar Cove with a friend, telling him that "the Lord would get him for it, and he shouldn't have done it."

---

[2] The investigation was conducted through a joint effort of the Jacksonville Sheriff's Office and the state attorney's office.

[3] Through this form, Grimes purported to assert his right to counsel under the Sixth Amendment and his right to remain silent and right to counsel under the Fifth Amendment.

Grimes began calling Pender from jail. Pender accepted approximately 70 collect calls from Grimes and recorded many of those conversations. Pender also visited Grimes at the jail. On January 22 or 23, 1995, investigators told Pender to solicit incriminating statements from Grimes. During a visit to the jail, Pender, at the direction of investigators, told Grimes that he knew some people who were involved in illegal activities and were interested in hiring someone with expertise in burning and bombing. Thereafter, Grimes and Pender talked many times about Grimes' interest in working for these people and his ability and experience regarding arson and bombing.

On February 8, 1995, Grimes pled guilty to the worthless check charges and was released from jail. Pender, at Grimes' request and on direction from investigators, picked Grimes up from jail. Grimes and Pender drove to a hotel in St. Augustine to meet with the people who were interested in hiring someone experienced with bombs. This, of course, was a ruse and the individuals waiting for Grimes and Pender were actually undercover investigators. Pender told Grimes that he could change his mind and Pender would take him to their hunting camp. He told Grimes that he did not have to meet with the business man "Frank," but Grimes said that he wanted to meet Frank. During the meeting, Grimes divulged many details about the Cedar Cove bomb.

5

After the meeting, Grimes and Frank got in a car and headed back towards Jacksonville.  On the way, a JSO officer stopped them, appeared to take Frank into custody, and asked Grimes to come to the police station.  At the police station, officers arrested Grimes on a state charge of arson of his mother's home.[4]

On April 5, 1995, a federal grand jury indicted Grimes for knowingly and maliciously damaging a building used in or affecting interstate commerce by means of an explosive.  The trial began on March 7, 1996.  Grimes was convicted by the jury and sentenced to life imprisonment by the trial judge.

## II.  DISCUSSION

On appeal, Grimes makes the following arguments:  (1) 18 U.S.C. § 844(i) is unconstitutional both facially and as applied; (2) Grimes was improperly denied benefits normally afforded to a person accused of a capital offense; (3) the district court erred by failing to suppress certain evidence obtained in violation of Grimes' Fifth and Sixth Amendment rights; and (4) application of amended limitations and sentencing statutes violated the *Ex Post Facto* Clause of the Constitution.[5]

---

[4] Prior to arrest, Grimes admitted that he burned his mother's home to keep his uncle from getting it in foreclosure.

[5] Grimes makes several additional arguments that merit no discussion here: (1) the district court erred by substituting an alternate juror; (2) Grimes was denied his constitutional right to indictment by grand jury; (3) the grand jury was improperly advised of the penalties attached to the crime; (4) the district court erred by admitting extrinsic act evidence under Rule 404(b) of the Federal Rules of Evidence; and (5) the grand and petit juries were improperly informed of the death

A.    Constitutionality of § 844(i)

Grimes argues that § 844(i) is unconstitutional both facially and as applied to him in this case. The argument is based on *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624 (1995), in which the Supreme Court found that the Gun Free School Zones Act was unconstitutional because it exceeded Congress's commerce clause authority.

The argument that § 844(i) is facially unconstitutional is without merit. Every circuit examining the issue after *Lopez* has determined that Congress did not exceed its commerce clause authority when it enacted § 844(i). *See United States v. Gaydos*, 108 F.3d 505, 508 (3d Cir. 1997); *United States v. Corona*, 108 F.3d 565, 570 (5th Cir. 1997); *United States v. McMasters*, 90 F.3d 1394, 1398 (8th Cir. 1996); *United States v. DiSanto*, 86 F.3d 1238, 1245-46 (1st Cir. 1996); *United States v. Sherlin*, 67 F.3d 1208, 1213-14 (6th Cir. 1995). We also hold that § 844(i) is constitutional on its face.

Grimes also argues that, even if § 844(i) is constitutional on its face, the Government did not show that the apartment building damaged by the explosion in this case had the requisite interstate commerce nexus. We hold that the Government demonstrated the necessary interstate commerce connection.

_____

of the victim. We affirm. *See* 11th Cir. R. 36-1.

7

In *Russell v. United States*, 471 U.S. 858, 862, 105 S. Ct. 2455, 2457 (1985), the Supreme Court found that § 844(i) "only applies to property that is 'used' in an 'activity' that affects commerce. The rental of real estate is unquestionably such an activity." In *Russell*, the Supreme Court upheld the defendant's § 844(i) conviction, in the face of a commerce clause challenge, for attempting to burn a two-unit apartment building. The Court noted that "the legislative history suggests that Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home." *Id*. Circuit courts examining *Russell*, including this one, have agreed that *Russell* remains authoritative precedent even after *Lopez*. *See Belflower v. United States*, 129 F.3d 1459, 1462 (11th Cir. 1997); *United States v. Chowdhury*, 118 F.3d 742, 743 (11th Cir. 1997); *United States v. Tocco*, 135 F.3d 116, 124 (2d Cir. 1998), *pet. for cert. filed*, No. 97-1596 (Mar. 27, 1998); *United States v. Nguyen*, 117 F.3d 796, 798 (5th Cir.), *cert. denied*, 118 S. Ct. 455 (1997); *United States v. Gaydos*, 108 F.3d 505, 508 (3d Cir. 1997); *United States v. DiSanto*, 86 F.3d 1238, 1245 (1st Cir. 1996). The apartment building damaged in this case satisfies the interstate commerce nexus of § 844(i) under the *Russell* standard. No constitutional violation results from the application of § 844(i) to Grimes here.

B.    Benefits Afforded to a Capital Defendant

8

Grimes argues that he should have received all of the procedural benefits afforded to a person in a capital case[6] even though the Government stated, on the record prior to trial, that it would not seek the death penalty in this case. This issue is controlled by binding precedent[7] which is in accord with a majority of other circuits. *See United States v. Kaiser*, 545 F.2d 467, 475 (5th Cir. 1977); *United States v. Crowell*, 498 F.2d 324, 325 (5th Cir. 1974); *United States v. Hoyt*, 451 F.2d 570, 571 (5th Cir. 1971); *United States v. Goseyun*, 789 F.2d 1386, 1387 (9th Cir. 1986); *United States v. Shepherd*, 576 F.2d 719, 727-29 (7th Cir. 1978); *United States v. Weddell*, 567 F.2d 767 (8th Cir. 1977); *United States v. Maestas*, 523 F.2d 316, 319 (10th Cir. 1975); *Loux v. United States*, 389 F.2d 911, 915 (9th Cir. 1968). The cited cases all indicate that a defendant is not entitled to benefits he would otherwise receive in a capital case if the government announces that it will not seek the death penalty or the death penalty is otherwise unavailable by force of law.[8] Grimes was properly denied benefits afforded to a capital defendant because the Government

---

[6] A capital defendant has the right to two appointed lawyers, 18 U.S.C. § 3005, a copy of the government's witness list and the venire three days before trial, 18 U.S.C. § 3432, and 20 peremptory challenges, Fed. R. Crim. P. 24(b).

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

[8] Only the Fourth Circuit has reached the conclusion that benefits afforded to capital defendants are available anytime the offense is punishable by death regardless of whether the death penalty is actually being sought. *United States v. Watson*, 496 F.2d 1125 (4th Cir. 1973).

9

stipulated that it would not seek the death penalty and thereby transformed this case into a non-capital proceeding.

C.     Admission of Grimes' Statements

When Grimes was arrested on worthless check charges, he signed a claim of rights form[9] and served copies on the state attorney's office and the JSO. Copies were also placed in his court and jail files. Grimes argues that his execution of the claim of rights form effectively invoked his Fifth Amendment and Sixth Amendment rights for all subsequent purposes, including the charges at issue here. He argues, therefore, that certain statements, including those he made to Pender while he was in jail and those he made to the undercover agent in St. Augustine, should have been suppressed.

1.     Sixth Amendment Right to Counsel.

---

[9] The claim of rights form, in pertinent part, provided:

1.   The Defendant, together with the undersigned counsel, the Public Defender for the Fourth Judicial Circuit of Florida, hereby asserts his/her right not to make any statements, oral or written, regarding the facts or circumstances of the offense(s) with which he/she is charged, or regarding the facts or circumstances of any criminal offenses for which he/she is not charged (but is merely a witness or suspect), unless his/her attorney is present during any questioning and/or making of any such statements. The Defendant claims his/her right to counsel and the right to remain silent pursuant to Amendments 5 and 6 of the Constitution of the United States.

2. Defendant further asserts that any future waiver to have counsel present or to remain silent must be in writing (with reference to this notice), and only after notice has been given to his/her attorney of the Defendant's intention to waive this right and an opportunity provided for the Defendant and his/her attorney to discuss the waiver of these rights.

10

The Sixth Amendment guarantees the right to counsel at all "critical stages" of a criminal prosecution. *Michigan v. Jackson*, 475 U.S. 625, 629-30, 106 S. Ct. 1404, 1407-08 (1986). The Supreme Court has stated that the Sixth Amendment right to counsel is offense specific. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207 (1991). Grimes' argument that the use of statements elicited by undercover agents after his arrest on unrelated charges violated his Sixth Amendment right to counsel therefore lacks merit. Even if Grimes' invoked his Sixth Amendment right to counsel, that right extends only to the worthless check charges and does not extend beyond that charge to the § 844(i) investigation. No Sixth Amendment violation occurred here.

2.    Fifth Amendment *Miranda* Rights.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), the Supreme Court recognized that, in order to protect a suspect's Fifth Amendment right not to incriminate himself, the suspect must be warned prior to custodial interrogation that he has the right to remain silent and the right to have an attorney present. In contrast to the Sixth Amendment right to counsel, these Fifth Amendment rights are not necessarily limited to the offense for which the suspect was arrested. The Fifth Amendment right to remain silent must be "scrupulously honored" once it has been invoked. *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 326 (1975) (quoting

11

*Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630). The Fifth Amendment right to counsel is not offense specific. *McNeil,* 501 U.S. at 177, 111 S. Ct. at 2208. The Fifth Amendment could therefore provide protection for Grimes here.

The Government argues that rights under the Fifth Amendment may not be anticipatorily invoked and that Grimes' execution of the claim of rights form was insufficient to invoke his *Miranda* rights. In support of its position, the Government cites *McNeil*, in which the Court noted that it has never held that *Miranda* rights can be anticipatorily invoked. *McNeil,* 501 U.S. at 182 n.3, 111 S. Ct. at 2211 n.3. The Court stated:

> If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against. The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

*Id.* Several circuits have held that *Miranda* rights may not be anticipatorily invoked. *See United States v. LaGrone*, 43 F.3d 332, 335-40 (7th Cir. 1994); *Alston v. Redman*, 34 F.3d 1237, 1242-51 (3d Cir. 1994); *United States v. Thompson*, 35 F.3d 100, 103-04 (2d Cir. 1994); *United States v. Wright*, 962 F.2d 953, 954-56 (9th Cir. 1992). The

12

Seventh Circuit stated that "in order for a defendant to invoke his *Miranda* rights, the authorities must be conducting interrogation, or interrogation must be imminent." *LaGrone,* 43 F.3d at 339. The court determined that such a formulation "advances the twin goals of *Miranda*: providing an opportunity for the defendant to dissipate the compulsion and allowing law enforcement the ability to conduct investigations." *Id.* at 339-40. We find the reasoning of our fellow circuits persuasive and hold that *Miranda* rights may be invoked only during custodial interrogation or when interrogation is imminent. We therefore hold that Grimes' execution of the claim of rights form was insufficient to invoke his *Miranda* rights.

The questions that remain are whether the police should have given Grimes a *Miranda* warning before government agents questioned him and, if so, whether statements made in the absence of a warning should have been suppressed. The Supreme Court in *Miranda* held that "the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S. Ct. 2394, 2397 (1990) (citing *Miranda*). The admission of Grimes' statements would be offensive to *Miranda* only if, at the time the statements were made, he was unwarned and was both (a) in custody and (b) being interrogated.

a.    The Saint Augustine Statements.

13

The question of whether a person is in custody is viewed from the perspective of a reasonable person in the position of the suspect. *United States v. Adams*, 1 F.3d 1566, 1575 (11th Cir. 1993). Grimes was not in custody when he talked to the undercover agent in St. Augustine. Pender gave Grimes the option of going somewhere other than to the hotel in St. Augustine. Grimes indicated that he wanted to go to the hotel and to talk to Frank. While at the hotel, Grimes was not restrained in any way. A reasonable person in the suspect's position would not have felt that he was in custody. *Miranda* warnings were not required before the meeting with Frank in St. Augustine. The district court did not err by denying the motion to suppress Grimes' statements to Frank.

b.      Statements to Pender.

The Supreme Court has stated that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689-90 (1980) (footnotes omitted). Under that definition, the only statements Grimes made to Pender that potentially implicate *Miranda* are the ones made after the police told Pender to solicit incriminating statements from Grimes. The statements Grimes made

14

prior to that time could not be the product of government compulsion because "[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *United States v. Washington*, 431 U.S. 181, 187, 97 S. Ct. 1814, 1818 (1977).

The Government argues that the coercion against which *Miranda* is designed to protect was not present when Pender attempted to solicit incriminating statements from Grimes. In *Perkins*, the Supreme Court considered whether a suspect's rights were violated when, without *Miranda* warnings, he was duped into making incriminating statements to an undercover officer posing as a fellow inmate. The Court concluded that *Miranda* warnings are not necessary in such a case because the ingredients of a police-dominated atmosphere and compulsion are not present when an incarcerated person speaks freely to a person that he believes is a fellow inmate. *Id.* at 296-97, 110 S. Ct. at 2397. The Court stated that "[w]here the suspect does not know that he is speaking to a government agent there is no reason to assume the possibility that the suspect might feel coerced." *Id.* at 299, 110 S. Ct. at 2398. The Court further noted:

> It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation. We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in

15

a technical sense and converses with someone who happens to be a government agent.

*Id.* at 297, 110 S. Ct. at 2397. In *United States v. Stubbs*, 944 F.2d 828 (11th Cir. 1991), we were confronted with a case where the defendant's codefendant and cellmate relayed the defendant's inculpatory statements to the police. The defendant challenged the admission of the statements and, relying on *Perkins*, we stated that "*Miranda* and Fifth Amendment concerns are not implicated when a defendant misplaces her trust in a cellmate who then relays the information — whether voluntary or by prearrangement — to law enforcement officials." *Id.* at 832. We then recognized that the rationale underlying *Perkins* is equally applicable in both the Fifth Amendment right to remain silent and right to counsel contexts. *Id.* We stated that "[f]or the same reasons that disposed of defendant's Fifth Amendment compelled self-incrimination claim, *Perkins* defeats defendant's argument that the circumstances of her conversation with her friend and fellow prisoner reflected compulsion and amounted to 'interrogation' for purposes of her Fifth Amendment right to counsel claim." *Id.* (footnote omitted). We also noted that the definition of interrogation was "further refined in *Perkins*, where the Court made clear that '[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*.'" *Id.* (quoting *Perkins*, 496 U.S. at 296, 110 S. Ct. at 2397). We believe that *Perkins*

16

and *Stubbs* control the outcome of this issue. We hold that the use of the conversations between Pender and Grimes do no violence to Grimes' Fifth Amendment rights or to the provisions underlying *Miranda*.

3. <u>Fifth Amendment Due Process Rights</u>.

Grimes also argues that some of the incriminating statements he made were not voluntary and that the circumstances that produced the statements involved a violation of Grimes' due process rights. When a defendant challenges the voluntariness of a confession, the government bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S. Ct. 515, 522 (1986); *Lego v. Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 626-27 (1972). "A district court's denial of a motion to suppress presents a mixed question of law and fact." *United States v. Behety*, 32 F.3d 503, 510 (11th Cir. 1994). Construing all facts in the light most favorable to the prevailing party, we review the district court's findings of fact for clear error but review the application of the law to the facts de novo. *Id.* We have reviewed Grimes' alleged errors and the record concerning this issue. The district court correctly concluded that the Government satisfied its burden of showing that the statements were voluntary.

D. *Ex Post Facto* Challenges

17

Grimes' final two issues center on the application of statutes amended after the commission of his crime. Grimes claims that the use of amended limitations and sentencing statutes violates the *Ex Post Facto* Clause of the Constitution. We hold that Grimes was properly tried and sentenced in this case.

In *Beazell v. Ohio*, 269 U.S. 167, 169-70, 46 S. Ct. 68, 68 (1925), the Supreme Court stated:

> It is settled, by decisions of this court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.

In *Collins v. Youngblood*, 497 U.S. 37, 42, 110 S. Ct. 2715, 2719 (1990), the Supreme Court noted that the *Beazell ex post facto* formulation "is faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause." Under the *Beazell* definition, application of amended statutes to crimes committed before the amendment is suspect and must be carefully scrutinized.

1. Statute of Limitations.

When Grimes committed this crime, the statute of limitations for a violation of § 844(i) was five years. After the crime was committed but before Grimes was

18

indicted, Congress extended the statute of limitations to seven years. The offense in this case was committed on March 19, 1990. Congress amended the statute effective September 13, 1994,[10] before the five-year statute for Grimes' offense expired. The grand jury indicted Grimes on April 5, 1995. The indictment came sixteen days after the five-year statute of limitations expired but well within the seven-year statute. Grimes argues that the application of the seven-year statute of limitations violates the *Ex Post Facto* Clause.[11]

The Government argues that there is no *ex post facto* violation here because the statute of limitations was extended before the original five-year statute had expired. Although we find no circuit cases that address this question under § 844(i), all of the circuits that have addressed the issue under other statutes have uniformly held that extending a limitations period before the prosecution is barred does not violate the *Ex Post Facto* Clause. *See United States v. Brechtel*, 997 F.2d 1108, 1113 (5th Cir. 1993); *United States v. Taliaferro*, 979 F.2d 1399, 1402-03 (10th Cir. 1992); *United*

---

[10] The five-year statute of limitations has since been reinstated.

[11] Grimes also argues that the application of the seven-year statute of limitations is a bill of attainder and violates the Due Process Clause of the Constitution. His due process argument apparently centers around an allegation that the statute was changed at the request of the Attorney General. He alleges that the Attorney General asked Congress to change the statute so that the investigation of Grimes' case could extend past the limitation set by law. This allegation has no support and the argument has no merit. His argument that the application of the seven-year statute of limitations to him amounts to a bill of attainder is likewise without merit. *See Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 468-71, 97 S. Ct. 2777, 2803-05 (1977).

*States v. Knipp*, 963 F.2d 839, 843-44 (6th Cir. 1992); *United States v. Madia*, 955 F.2d 538, 539-40 (8th Cir. 1992); *United States ex rel Massarella v. Elrod*, 682 F.2d 688, 689 (7th Cir. 1982); *United States v. Richardson*, 512 F.2d 105, 106 (3d Cir. 1975); *Clements v. United States*, 266 F.2d 397, 399 (9th Cir. 1959); *Falter v. United States*, 23 F.2d 420, 425-26 (2d Cir. 1928). We now join our fellow circuits in holding that a statute of limitations extended before the original limitations period has expired does not violate the *Ex Post Facto* Clause.

2.  Sentencing Statute.

On June 25, 1996, the district court sentenced Grimes to life in prison. Grimes argues that sentence was improper because, under the version of the statute in place at the time the crime was committed, only a jury could give a life sentence. Grimes therefore contends that the district court exceeded its statutory authority in sentencing him.

Until 1994, § 844(i) set out the penalties for maliciously damaging or destroying a building used in or affecting interstate commerce and stated that "if death results . . . [the defendant] shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title." 18 U.S.C. § 844(i) (1988). Section 34, in turn, provided that "[w]hoever is convicted of any crime prohibited by this chapter, which has resulted

20

in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct." 18 U.S.C. § 34 (1988). In 1994, both § 844(i) and § 34 were amended. The 1994 amendment to § 844(i) omitted the reference to § 34 and the section now states that "if death results . . . [the defendant] shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment." 18 U.S.C. § 844(i) (1994). Section 34 now states "[w]hoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life." 18 U.S.C. § 34 (1994). Relying on cases decided under the pre-1994 version of the statutes, Grimes argues that only the jury could impose a life sentence and that the trial judge exceeded his statutory authority when he sentenced Grimes to life in prison.

The general rule is that a defendant should be sentenced under the law in effect at the time of sentencing. *See Blaik v. United States*, 117 F.3d 1288, 1294 (11th Cir. 1997) (citing *United States v. Guardino*, 972 F.2d 682, 687 (6th Cir. 1992)); *see also Hughey v. United States*, 495 U.S. 411, 413 n.1, 110 S. Ct. 1979, 1981 n.1 (1990) (agreeing with the lower court's implicit conclusion that the law in effect at the time of sentencing controls), *superseded by statute on other grounds as noted in United States v. Arnold*, 947 F.2d 1236, 1237 (5th Cir. 1991). The rule

21

does not apply, however, if application of the law in effect at the time of sentencing would violate the *ex post facto* provision of the Constitution. *See United States v. Sloan*, 97 F.3d 1378, 1381 n.4 (11th Cir. 1996) (noting that the version of the Sentencing Guidelines in effect at the time of sentencing may not be applied if such an application would violate the *Ex Post Facto* Clause of the Constitution); *Miller v. Florida*, 482 U.S. 423, 107 S. Ct. 2446 (1987) (reversing and remanding for resentencing under the provisions in effect at the time of the offense because application of the provisions in effect at the time of sentencing violated the *Ex Post Facto* Clause of the Constitution). The version of § 844(i) in effect at the time of sentencing did not refer to § 34 and contained no restriction that a life sentence could be imposed only by a jury. Under the general rule, the district court properly sentenced Grimes under the version of the statute in effect at the time of Grimes' sentencing unless application of that version violated the *Ex Post Facto* Clause of the Constitution.[12]

---

[12] It is true, as Grimes contends, that circuit courts considering the application of the pre-1994 versions of § 884(i) and § 34 have consistently concluded that only a jury had authority to impose a life sentence and that the judge could only impose a sentence for a term of years less than life. *See United States v. Tocco*, 135 F.3d 116 (2d Cir. 1997), *pet. for cert. filed*, No. 97-1596 (Mar. 27, 1998); *United States v. Gullett*, 75 F.3d 941 (4th Cir.), *cert. denied*, 117 S. Ct. 134 (1996); *United States v. Prevatte*, 16 F.3d 767 (7th Cir. 1994); *United States v. Williams*, 775 F.2d 1295 (5th Cir. 1985); *United States v. Hansen*, 755 F.2d 629 (8th Cir. 1985). Those courts, with the possible exception of the *Tocco* Court, were not faced with the question presented in this case: whether the application of the amended version of the statutes would violate the *Ex Post Facto* Clause of the Constitution. The Second Circuit in *Tocco* stated without discussion or analysis that "the *Ex Post*

The *ex post facto* concern implicated here is the requirement that a statute not make the punishment for a crime committed before its enactment more onerous. Grimes argues that allowing a judge to impose a sentence that could formerly only be imposed by the jury runs afoul of that requirement. The Government responds that the change in the statute did not affect the substantive nature of crime and was only a change in procedure. This argument is based on the Supreme Court's statement that "[s]everal of our cases have described as 'procedural' those changes which, even though they work to the disadvantage of the accused, do not violate the *Ex Post Facto* Clause." *Collins*, 497 U.S. at 45, 110 S. Ct. at 2720 (citations omitted). The Court stated further that "[w]hile these cases do not explicitly define what they mean by the word 'procedural,' it is logical to think that the term refers to changes in the procedures by which a criminal case is adjudicated, as opposed to changes in the substantive law of crimes." *Id.* The Government contends that the amendment in this case, which removed the restriction that only a jury could impose a life sentence, is merely procedural and therefore does not implicate the *Ex Post Facto* Clause.

---

*Facto* Clause precludes application of the 1994 amendment since [the defendant] committed the arson in 1992 and, under the *Ex Post Facto* Clause, a retroactive change in the definition of a crime or a retroactive increase in punishment for a criminal act is forbidden." *Tocco*, 135 F.3d at 132 (citations omitted). It is unclear whether the issue was presented by the case or whether these statements are merely dicta; regardless, as will be seen below, we disagree with the conclusion that application of the 1994 amendments violates the *Ex Post Facto* Clause.

The amendment at issue here is not very far removed from the amendment at issue in *Dobbert v. Florida*, 432 U.S. 282, 97 S. Ct. 2290 (1977). In *Dobbert*, the Supreme Court considered an *ex post facto* challenge to the application of a statute which changed "the function of the judge and jury in the imposition of death sentences in Florida between the time [Dobbert] committed the acts charged and the time he was tried for them." *Id.* at 287, 97 S. Ct. at 2295. At the time Dobbert committed the crime, the Florida statute provided that the penalty for his actions would be death "unless the verdict included a recommendation of mercy by a majority of the jury." *Id.* at 288, 97 S. Ct. at 2296. In the intervening time between the commission of the crime and Dobbert's trial and sentencing, the Florida legislature enacted a new death penalty statute which provides that, after a conviction, a separate sentencing hearing is held before the trial judge and the trial jury. *Id.* at 290, 97 S. Ct. at 2297. The jury, considering certain aggravating and mitigating factors, renders an advisory decision. *Id.* at 291, 97 S. Ct. at 2297. The decision is not binding on the trial judge and the trial judge weighs the same aggravating and mitigating circumstances. *Id.* The trial judge then sentences the defendant but must set forth written findings of fact concerning the aggravating and mitigating circumstances if the death sentence is imposed. *Id.* In Dobbert's case, the advisory jury recommended life imprisonment but the trial judge rejected that recommendation and sentenced Dobbert to death.

24

Dobbert claimed that the application of the amended Florida death penalty statute was *ex post facto* as applied in his case. The Supreme Court determined that "[t]he new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." *Id.* at 293-94; 97 S. Ct. at 2298. The Court concluded that "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto*." *Id.* at 293; 97 S. Ct. at 2298.

We believe that the Supreme Court's decision in *Dobbert*, that a procedural change in the judge's and the jury's role in the imposition of punishment does not violate the *Ex Post Facto* Clause, is equally applicable in this situation. As in *Dobbert*, the punishment attached to this crime is not altered by the amendment to the statute; the only change is a procedural one that allocates responsibility between two different decision makers. We hold that the application of the post-1994 version of § 844(i) does not violate the *Ex Post Facto* Clause of the Constitution and that the trial judge did not exceed his statutory authority by imposing a life sentence.

Finally, Grimes argues that the application of the amended version of § 844(i) is *ex post facto* because the application of the Sentencing Guidelines eliminated the discretion provided to the decision maker under the pre-1994 statutes. Grimes' guideline range was life in prison. He therefore argues that the trial judge did not have

25

the discretion to give him less than a life sentence whereas a jury, under the prior versions of § 844(i) and § 34, was explicitly given discretion. Grimes contends that the absence of that discretion in his case causes the application of the post-1994 § 844(i) to be a violation of the *Ex Post Facto* Clause. Grimes did not present this argument to the district court. We generally will not consider an argument made for the first time on appeal and will review it only "under the plain error doctrine to avoid manifest injustice." *United States v. Stevenson*, 68 F.3d 1292, 1294 (11th Cir. 1995) (citations and internal quotations omitted). "For the Court to correct plain error: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights." *Id.* (citations omitted). Even if we assume that the first and third elements could be met in this case, we hold that the alleged error is not plain and does not meet the second element.

### III. CONCLUSION

For the reasons stated above, we affirm Grimes' conviction and sentence, holding that: section 844(i) is constitutional both facially and as applied in this case; Grimes was properly denied benefits afforded to a capital defendant; the district court did not err by denying Grimes' motion to suppress; the application of the amended statute of limitations did not violate the *Ex Post Facto* Clause of the Constitution; and

26

Grimes was properly sentenced under the statutes in effect at the time of his sentencing.

AFFIRMED.

HOEVELER, Senior District Judge, specially concurring:

I concur with the well constructed opinion of Judge Black but wish only to note my concern regarding the issue of the effect of the application of the guidelines in eliminating the jury's discretion in imposing a life sentence – the final issue addressed in the opinion. As Judge Black correctly notes, there are compelling reasons to restrain this court's consideration of the issue; nevertheless, I write to indicate my initial impression that this may be a colorable claim – one to be presented in another, more appropriate proceeding.