**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**RAPHAEL RIVERA, Defendant**

Criminal No. F154/2002

Territorial Court for the Virgin Islands

Division of St. Thomas and St. John

April 17, 2003

ERNEST F. BASON, ESQ., Assistant Attorney General, St. Thomas, Virgin Islands, *Attorney for Plaintiff*

ALAN D. SMITH, ESQ., St. Thomas, Virgin Islands, *Attorney for Defendant*

SWAN, *Judge*

## MEMORANDUM OPINION

### (April 17, 2003)

Before the Court is Defendant's motion to suppress written and oral statements he made to two detectives and to suppress a weapon he gave to the detectives. Defendant asserts that the statements were coerced and made in the absence of an attorney, even though he had requested an attorney. The Government asserts that Defendant's statements were voluntarily made to the detectives, even though Defendant was advised of his Constitutional Rights to counsel. Additionally, the two detectives that took Defendant's statements assert that Defendant never requested an attorney nor requested to speak to an attorney prior to making and signing his statements.

On April 19th, 2003, Detectives Rosalyn Bedminister and Police Sergeant Roberto Lima received a telephone message from the Defendant, requesting that they meet him in the western part of St. Thomas in the area of Stumpy Bay. The Defendant's call was prompted by his having previously received a message from Detective Mario Stout, informing Defendant that Detective Stout wished to speak to him, concerning the disappearance of Ms. Ianthe Thomas, Defendant's live-in girlfriend.

Both Bedminister and Lima proceeded to the Estate Fortuna area in a police vehicle. They met Defendant at the entrance to Stumpy Bay. Defendant approached the police vehicle and identified himself to the detectives. Defendant likewise instructed the officers to follow him in their vehicle while he led them in his pick-up truck. Both vehicles proceeded to the Defendant's residence, which was a five-minute drive away.

Upon their arrival at Defendant's residence, the officers and Defendant congregated on the porch. The Defendant commenced telling the officers about his childhood and about the deceased, Iantha Thomas. While relating to the officers about his childhood, Defendant lamented how he had a "rough time" growing up. For approximately forty-five minutes, Defendant spoke without interruption from the officers. Defendant also told the officers about his house, how he built it, and the landscaping he performed around the house. Several times during the making of his statement, Defendant became emotional and cried. During these episodes, the officers would listen and patiently await the Defendant's resumption of his statements.

Eventually, Defendant began to talk about the deceased, at which time, Detective Bedminister advised Defendant of his Constitutional Rights. She further explained to the Defendant what was written on the waiver of rights form. Subsequently, the waiver of rights form would be signed and dated by Defendant, and Bedminister would record the time Defendant signed the form.

In making his statements, Defendant informed the detectives of where he had buried the body of the deceased, Ianthe Thomas, and took them to the deceased's place of burial. The police authority would exhume the deceased's body and remains from the same place Defendant informed the detectives was the place where he had buried her.

The Defendant asserts that he was coerced into signing the waiver of rights form. Specifically, Defendant contents that the officers told him, *"if he didn't cooperate with them, things would get rough for him."* Likewise, Defendant asserts that he requested an attorney prior to signing the waiver, but his request and plea were ignored and rejected by the officers. Similarly, Defendant accused Sergeant Roberto Lima of telling him that he didn't need a lawyer. Defendant further asserts that Sergeant Lima told him that he can secure a search warrant to search the Defendant's house, presumably if Defendant did not cooperate and give his statements.

The Court finds that during the meeting between Defendant and the detectives the Defendant was not inebriated or intoxicated; there was no smell of alcohol on his breath. He never appeared to have an unsteady gait or walk when he, at one time during his interview, left the porch, walked into the house and returned to the porch.

Defendant appeared to be lucid in his mental processes. While Defendant did take medication, the Court concludes that none of the medication was of a type that would interfere with or adversely impact his mental faculties before or during his interview and discussions with the detectives. Two of the medications Defendant ingested on the date of the interview were a muscle relaxant and a medication for insomnia.

■■ *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed. 2d 694 (1966) requires that before questioning a suspect in custody, law enforcement officials must inform the suspect of the *Miranda* warnings. Interestingly, the *Miranda* warnings are only required when a suspect is both in custody and subjected to state interrogation. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S. Ct. 2394, 2397, 110 L. Ed.243 (1990). By custody is meant the deprivation of *"freedom of action in any significant way."* 384 U.S. at 444. Custody now means formal arrest or restraint on freedom of movement of the degree associated with formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. 3d 1275 (1983). The Defendant has the burden of proving custody. *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984).

■ The Fifth Amendment right to counsel can only be invoked while a suspect is in custody. In *United States v. La Grone*, 43 F.3d 332 (7th Cir. 1994), the Court opined that defendants cannot invoke their *Miranda* rights outside the context of custodial interrogation. *See also United States v. Thompson*, 35 F.3d 100 (2d Cir. 1994); *United States v. Wright*, 962 F.2d 953 (9th Cir. 1992).

■ To determine whether a suspect is in custody, the Court must consider the totality of circumstances and whether there existed a formal request or restraint of Defendant's freedom of movement at a level associated with formal arrest. Importantly, giving the *Miranda* warning in a non-custodial setting does not convert the setting into a custodial setting. *United States v. Lewis*, 556 F.2d 385 (6th Cir. 1977).

The Defendant was questioned at his residence, which is a familiar and comfortable setting for him. It was done in a relaxive atmosphere on his house porch. There were no arguments or shouting between Defendant and the detectives. The detectives never brandished or displayed their weapons, overtly or subtlety, in Defendant's presence. It was unlike a coercive and hostile environment usually found at a police station. If questioning takes place in surroundings familiar to the suspect, custody is less likely to be found. *See Beckwith v. United States*, 425

U.S. 341, 345-347, 96 S. Ct 1612, 48 L. Ed. 2d 1 (1976); in which the High Court said that interviews in the suspect's home are generally non-custodial. Likewise, in *United States v. Rith*, 164 F.3d 1323, 1332, (10th Cir. 1999), the Court opined that *Miranda* warnings were not required, because Defendant was not threatened or subjected to physical punishment and was in comfortable surroundings of his home when he made voluntary statements. *See also United States v. Crossley*, 224 F.3d 847, 862 (6th Cir. 2000), in which no *Miranda* Warning was required when Defendant was interviewed at her job and was never told she could not leave.

Defendant Rivera was not handcuffed while he was interviewed in the familiar surroundings of his home. He was never told he could not stop talking. If a Defendant wants to be loquacious and volunteer statements to police, the making of the statements does not trigger the *Miranda* warnings. The Defendant spoke voluntarily and chose the subjects on which he spoke. It was only after Defendant started to volunteer information surrounding the disappearance of Ms. Thomas that the detectives took his statements, after he was given his *Miranda* Warnings. Importantly, an explicit waiver is not necessary to prove a Defendant waived his right to remain silent when Defendant volunteered incriminating statements. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979). Additionally, there is not an iota, modicum, or scintilla of evidence that Defendant's freedom was ever impeded or obstructed by the detectives, nor was Defendant deprived of his freedom of movement in any way. Therefore, the Court concludes that Defendant was not in custody at the time he made his inculpatory statements to the detectives.

Importantly, during the interview, the detectives never mentioned they had a weapon or gun during their conversation with Defendant or when he was volunteering his statements. If Defendant wanted or needed an attorney before giving his statement, he had ample time and opportunity to secure one before he left home to meet the officers at Stumpy Bay in the western section of the island. For example, Detective Stout had called the Defendant and left a telephone message for him at least a day or two before Defendant met with the two detectives, Bedminster and Lima. Certainly, the Defendant had more than an inkling as to why the detectives wanted to speak with him. Therefore, he had days before

230

meeting the detectives within which to retain counsel, if that was his intention.

Similarly, when the detective contacted Defendant and drove to Stumpy Bay to meet him, Defendant had an idea as to the subject about which the detectives wanted to talk about. Defendant told the detectives on the telephone that he wanted to talk to them.

The waiver of rights form was read to the Defendant and not surprisingly for someone with an eighth grade education, he understood what was read to him. Defendant signed the statement voluntarily. There was nothing to prevent Defendant from calling a lawyer from his home before the detectives' arrival or during his conversations with the detectives. Defendant never asserted that the officers physically restrained or prevented him from access to a phone.

Unlike a naïve teenager, Defendant is thirty-seven (37) years of age with full command of his mental faculties. Nothing Defendant said during his conversation with the officers suggests that he was intimidated, threatened or coerced by the officers.

Importantly, considering the totality of circumstances, the Court finds that Defendant was not in custody when he gave his statements to the detectives; therefore, there was no custodial interrogation when Defendant made his statements. Volunteered statements are not covered by *Miranda. United States v. Moreno-Flores*, 33 F.3d 1164 (9th Cir. 1994). From Defendant's preliminary conversations with the officers, it appears that the Defendant wanted to unburden himself and free and relieve his conscience of his role in Ms. Thomas' demise. A Defendant's statements are involuntary if the Court concludes from the totality of circumstances that a Defendant's will was overborne by physical or psychological pressure. *Arizona v. Fulminante*, 499 U.S. 279, 285-89, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961). Conspicuously absent during Defendant's interview with the detectives were any form of physical or psychological pressure that can conceivably make Defendant's statement involuntary. Defendant chose his subject matter when he decided to tell the detectives of his role in Ms. Thomas' death. His statements were voluntarily made, including the statements he made on other subjects matters during the interview. Because Defendant was not in custody when he voluntarily made his statement, the *Miranda* warnings were inapplicable.

231

There was no language barrier between Defendant and the detectives. Defendant fully understood what he was saying to the detectives. Moreover, there was no lapse of time between when Defendant waived his *Miranda* rights and when he gave his statements to the detectives.

Defendant said he had taken some medication. However, in *United States v. Korn*, 138 F.3d 1239, 1240 (8th Cir. 1998), the Court found a valid waiver despite Defendant's claim he was under the influence of drugs. Likewise, in *Shackleford v. Hubbard*, 234 F.3d 1072, 1080-1081 (9th Cir. 2000), the Court found a valid waiver, because Defendant was articulate and responsive to questions, and his confession was voluntary and intelligent. Again, the nature of Defendant's medication never impacted or diminished his mental faculties. The Court concludes that the totality of circumstances surrounding Defendant's statements does not suggest that his statements were coerced and involuntarily made. Likewise, the confession was not obtained in a manner "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109, 1106 S. Ct. 445, 88 L. Ed. 2d 405 (1985). Out of an abundance of caution, Detective Bedminister, to her credit and based on her experience, mirandized the Defendant and explained to him the warning as to his rights and waiver form before he gave his statements.

Defendant is intelligent with an eighth grade education. He is thirty-seven years of age with no discernible physical or mental deficiencies. He appeared not to have a drug or alcohol problem.

Detective Lima has denied that Defendant ever asked for a lawyer or that he ever told Defendant that it would be in Defendant's best interest to continue to talk. Detective Lima further testified that Defendant never expressed any reluctance to talk or to stop talking in the presence of the Detectives. Lima also testified that Detective Bedminister had advised Defendant of his *Miranda* rights and had explained the waiver form to Defendant before he signed the waiver. He also denied that he ever told Defendant that "things would or could get rough for him if he doesn't talk." Detective Bedminister maintains that as soon as Defendant's voluntary statements changed to the subject of the deceased, Defendant was advised of his rights. Detective Bedminister is emphatic that after Defendant was advised of his rights, he never asked for nor requested a lawyer, before or during his interview. The Court finds that Detective Bedminister informed Defendant of his *Miranda* rights and told

Defendant that if he waives his rights, he must sign the waiver form. The waiver form, government's exhibit M-1, was signed in two places by Defendant. First, he signed the portion entitled "Warning as to Rights" at 10:00 a.m. and the portion on the "Waiver" was signed at 10:12 a.m. The Defendant's statements, according to government's exhibit M-4, commenced at 10:14 a.m., the same morning of April 19th, 2002. The Court further finds that the waiver of right form was read to Defendant, and he understood what was read to him. Consequently, the Court concludes that Defendant knew what he was doing when he gave his statements and signed the "waiver form" tendered to him by the detectives; therefore, the Court concludes that Defendant knowingly, voluntarily and intelligently waived his Constitutional rights when he made statements to the detectives.

Detective Bedminister asked Defendant a total of eleven (11) questions, with the main question being, "Is there anything that you would like to tell us concerning Ms. Mae Thomas?" The nature and form of the questions and their limited number hardly give rise to an oppressive atmosphere of interrogation. Rather, the question allowed Defendant the total discretion to discuss any aspect about the deceased he chose to discuss in narrative form.

The detectives never searched the Defendant's home for the gun. After Defendant mentioned the gun in his statement to the detectives, Detective Lima asked Defendant to get the weapon, and Defendant personally retrieved the weapon from his home. A search is a governmental invasion of a person's privacy. *See, Oliver v. United States*, 466 U.S. 170, 177-178, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). Neither detective ever conducted a search of Defendant's person or his home for the weapon. Therefore, there is no Fourth Amendment issue in this case.

Considering the "totality of circumstances" of facts of this case, the Court finds that there was no "custodial interrogation" in this case. Also, the Defendant intelligently waived his rights and knowingly gave statements to the detectives.

Accordingly, the Court holds that Defendant's statements to the detectives that were made in an interview conducted in his home, devoid of coercion, intimidation, or physical or psychological pressures, and further made while he had full command of his mental faculties when he waived his Fifth Amendment Right by a written waiver, is a valid waiver

of his Constitutional Rights. The Court further holds that under the totality of circumstances, the Defendant's waiver of his Constitutional Rights was knowingly, intelligently and voluntarily made, and his Constitutional Rights were *not* violated.

Therefore, Defendant's motion to suppress his statements made to the detectives and to suppress the weapon he tendered to the detectives is DENIED, and an order shall be entered accordingly.