317 Ga. 585
FINAL COPY

S23A0534. JENKINS v. THE STATE.

PETERSON, Presiding Justice.

The question in this case is whether Larry Jenkins's unequivocal statement that he would not talk to law enforcement without a lawyer was a valid invocation of his *Miranda*[1] rights. Agreeing with the State, the trial court concluded that the statement came at a time that Jenkins was not being interrogated and at which no interrogation was imminent, and thus it was "anticipatory" and invalid under a line of precedent from several federal courts of appeals. We need not decide here whether that line of precedent is correct, because the trial court erred by extending that precedent to the circumstances in this case. At the time that Jenkins invoked his *Miranda* rights, he (1) was in custody for the crimes at issue in this case, (2) had been given *Miranda* warnings, (3) had already been

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

subjected to custodial interrogation by law enforcement on the way to the jail, and (4) was going through the booking process. Whether or not the booking process itself was custodial interrogation, the facts of this case show that a reasonable person in Jenkins's position would have believed that interrogation was at least imminent. Accordingly, his unequivocal invocation was valid, the State's failure to honor it rendered his custodial statements inadmissible, and the State has failed to show that the use of that inadmissible evidence was harmless. Accordingly, we reverse Jenkins's convictions; because the evidence against him was constitutionally sufficient, he may be retried.

Before his 1995 trial, Jenkins moved to suppress his confession and other evidence gathered therefrom; the trial court granted his motion. Even without that evidence, Jenkins was convicted and sentenced to death for a murder he committed when he was 17; we affirmed in 1998. In 2005, a habeas court vacated his death sentence under *Roper v. Simmons*, 543 U.S. 551 (125 SCt 1183, 161 LE2d 1) (2005), and granted a new trial on the basis of ineffective assistance

of trial counsel; we affirmed in 2006. In 2014, the State, seeking to retry Jenkins, filed a "Motion to Admit into Evidence at Trial Defendant's Post-Arrest Statements to Law Enforcement Officers and Physical Evidence Discovered from Interrogation of the Defendant," which the trial court and parties treated as a motion to reconsider the previously granted motion to suppress.[2]

---

[2] In late January 1993, a Wayne County grand jury indicted Jenkins on several charges, including as pertinent here, two counts of malice murder, armed robbery, kidnapping with bodily injury, two counts of theft by taking, and theft by receiving stolen property, and he was convicted on all of those counts and sentenced to death following a September 1995 trial. See *Jenkins v. State*, 269 Ga. 282, 283 n.1 (498 SE2d 502) (1998). This Court affirmed Jenkins's convictions and sentences. See id. A habeas court later vacated his death sentences (the Supreme Court had held in *Roper* that the United States Constitution forbade imposing the death penalty on juvenile offenders, and Jenkins was 17 at the time of the crimes) and convictions (for ineffective assistance of counsel in failing to conduct a reasonable investigation). This Court affirmed the grant of habeas relief on appeal. See *Terry v. Jenkins*, 280 Ga. 341 (627 SE2d 7) (2006).

In September 2014, a jury found Jenkins guilty of all counts: two counts of malice murder, one count of armed robbery, two counts of kidnapping with bodily injury, two counts of theft by taking, and one count of theft by receiving stolen property. The trial court sentenced Jenkins to serve consecutive terms of life in prison on the two malice murder counts, the armed robbery charge, and one of the kidnapping counts; the court also imposed a consecutive ten-year term on the theft by taking count. The remaining counts merged for sentencing purposes. On November 13, 2014, Jenkins filed a timely motion for new trial, which he amended through new counsel on August 22, 2020. Following an evidentiary hearing, the trial court granted Jenkins's motion for new trial on the theft by taking and theft by receiving stolen property counts, but otherwise denied Jenkins's motion for new trial. Jenkins filed a timely

The trial court determined that Jenkins's custodial statements (including a confession) were admissible because Jenkins had not validly invoked his right to counsel under *Miranda*. The court reasoned that 17-year-old Jenkins's invocation was "anticipatory" because, even though he was in custody, had been advised of his *Miranda* rights, and during booking by law enforcement unequivocally stated that he would not talk without the assistance of an attorney, Jenkins was merely going through the booking process, not being formally interrogated. After his confession was introduced against him at his second trial, Jenkins was convicted and this appeal ensued.

On appeal, Jenkins argues that the trial court lacked the authority to revisit the prior suppression order, and that even if it had such authority, the trial court erred in concluding that his

notice of appeal to this Court, but the appeal was dismissed due to the pendency of his theft counts in the trial court. See *Seals v. State*, 311 Ga. 739 (860 SE2d 419) (2021). After the trial court dismissed the theft counts at the request of the State, Jenkins filed a timely second notice of appeal to this Court on January 10, 2023. The case was docketed to this Court's April 2023 term and was submitted for a decision on the briefs.

4

invocation of his rights was ineffective because it was anticipatory. Because the trial court erred in concluding that the statements were admissible, we do not reach the issue of the trial court's authority to reconsider the previous ruling.[3] Even under the "no anticipatory invocation" rule relied on by the State (a rule that we have never adopted and express no view on today), a defendant can effectively invoke his *Miranda* rights if an interrogation is "imminent," and under the facts of this case detailed below, the State has not met its burden of showing that a suspect in Jenkins's position would not have reasonably believed an interrogation was imminent. We therefore reverse.

1. *The Trial Evidence*

The evidence presented at Jenkins's 2014 retrial showed that, around 7:00 p.m. on January 8, 1993, Terry Ralston and her oldest son, Michael, left their home in Terry's 1991 white Chevy Lumina van to close one of the laundromats that Terry's parents owned in

---

[3] We express no view about the merits of the dissent's treatment of this very difficult state-law question.

Jesup. In addition to cleaning the facility that evening, Terry was also scheduled to collect quarters from the machines. Around 10:00 p.m., when Terry and Michael had not returned home from the laundromat, Terry's father went to the laundromat to check on them, but they were not there. Later that night, Terry's husband contacted law enforcement to report that Terry and Michael were missing. Law enforcement began looking for Terry and Michael and the Chevy Lumina.

On the morning of January 9, two employees of a railroad company discovered two bodies — later identified as Terry and Michael — in a shallow ditch a short distance away from the railroad tracks. The employees immediately called law enforcement, and law enforcement officers from the Wayne County Sheriff's Department, the Jesup Police Department, the GBI, and the Department of Natural Resources arrived on the scene shortly thereafter.

The night before the bodies were found, between 9:00 and 10:00 p.m., a police officer had noticed a white van near the train tracks where the victims' bodies were found. The officer testified that the

6

van he saw that night looked similar to Terry's Chevy Lumina van. During the late morning hours of January 9, police began looking for Terry's van. Officer Glenn Jackson and another police officer drove to an overpass area by the railroad tracks in anticipation of the van traveling in that direction. Shortly thereafter, Officer Jackson "observed the white van come over the hump of the railroad tracks and about halfway down around the curve" and come to a stop, at which point four "male subjects jumped out and started running in different directions." Officer Jackson pursued the driver of the van, who ran toward the adjacent railroad tracks, slid under a boxcar, and then escaped into the woods on the other side, where Officer Jackson lost sight of him.

Captain Doug Lewis with the Department of Natural Resources — who had been working alongside other law enforcement agencies to help secure the crime scene — testified that he also heard a radio call reporting that a white van had been seen in Jesup by the overpass and that law enforcement was requesting assistance for "some people that were fleeing" from the van and

"running up the railroad tracks." Captain Lewis drove to that area and parked his vehicle. He did not see any of the suspects, but he walked around the area adjacent to the overpass and noticed a green backpack lying on the ground. Captain Lewis contacted a GBI agent to come and secure the backpack. GBI Agent Weyland Yeomans testified that he met Captain Lewis at the location of the backpack, and he seized the bag and its contents. Agent Yeomans testified that there was $142.50 in the bag, almost all of it in quarters. Agent Yeomans also found quarter wrappers in the bag, some of which had quarters inside of them, as well as a Kentucky Fried Chicken name badge with the name "David" on it.

While Officer Jackson was still monitoring the overpass area, Annie Ruth Mathis — a woman who lived nearby — approached him and advised that she had brought him a gun that her children and grandchildren had discovered near her house. Officer Jackson retrieved the gun and contacted GBI agents to inform them that he had received a gun that might be related to the crimes. Officer Jackson later testified that the gun was a Grendel handgun, but he

was not certain of the caliber.

Mathis testified that she lived about one or two blocks away from the overpass. She was at home on January 9, and around lunchtime, she walked out onto her porch with her husband and her son because they heard an airplane flying over their house.[4] Mathis noted that the airplane was circling low over the area. Around the same time, Mathis saw Jenkins — whom she had known since he was a baby — walking down the street, and she saw him throw something "out of his hand." As Jenkins got closer to her house, a person inside the airplane screamed down for Mathis and her family to get back inside the house because "he" — referring to Jenkins — was "dangerous." Mathis said that Jenkins started "jogging" at that point and jogged "right in front of [her] house and jogged right on around the corner and on down the street." Mathis went around to her back yard, and a few minutes later, one of her grandchildren came running into the back yard and handed her a gun inside a

---

[4] Testimony at trial established that law enforcement officers were also flying a plane through this area in search of the missing white van and the suspects.

"little black pouch thing." Mathis testified that her children and grandchildren had been playing outside in the street in front of her house when they found the gun. Mathis said she put the gun in her car, "took it up the road" to the railroad tracks where she had "seen the police[,]" and gave it to one of the officers.

Ken Mullis, a deputy with the Wayne County Sheriff's Department, testified that he had been part of the search for the missing Chevy Lumina van and the suspects on January 9. According to Deputy Mullis, he had been "listening to the radio traffic from the airplane" when he heard that the van had been located. He got into his patrol car and headed toward the overpass area where the van had stopped. As he was driving, he looked in his rearview mirror and saw someone running. Deputy Mullis gave chase on foot and saw the individual trying to crawl under a trailer. Deputy Mullis apprehended the individual, later identified as Jenkins. Deputy Mullis testified that he read Jenkins his *Miranda* rights on the way to the patrol car, and he then transported Jenkins to the Wayne County Jail. While Jenkins was being booked into the

jail, Jenkins said he wanted an attorney before answering any questions. The booking officer — Angela Robinson — pulled a learner's permit out of Jenkins's right pocket and gave it to Deputy Mullis. The learner's permit belonged to Michael Ralston.

During a subsequent search of the interior of the Chevy Lumina van, GBI Agent Yeomans located a .22 Magnum clip on the front driver's side floorboard, some loose quarters and quarter sleeve wrappers, and a green and gold tote bag containing a few quarters and articles of clothing. Agent Yeomans also searched the area around the van, and about five feet away from the passenger side door of the van, he found a camouflage cooler bag containing "a .22 Magnum pistol, a .44[-]caliber pistol, and a 9mm pistol," along with "about four .44 Magnum shells." Officers, who had been unable to thoroughly search the crime scene because it had been under a few inches of water, returned to the crime scene with a metal detector to look for bullets or cartridge cases. Officers located six cartridge cases and one metal projectile, all .22-caliber ammunition.

Dr. John Parker, a medical examiner and forensic pathologist for the GBI, testified that he performed the autopsies on Terry and Michael. According to Dr. Parker's testimony, Terry was shot on the "right side of the back of the head," and Michael was shot six times — four in his back, one in his arm, and one in his left temple — and the cause of death for both victims was a gunshot wound to the head. Dr. Parker removed several bullets from both victims during the autopsies, which were then sent to the ballistics section of the forensic laboratory at the GBI for testing.

Dr. Roger Parian, a firearms examiner for the GBI, testified that he tested the bullets and cartridge cases recovered from the crime scene and the victims. Dr. Parian determined that all of the recovered bullets and cartridge cases had been fired from the gun recovered by Mathis and turned into police — a Grendel .22 Magnum handgun.[5]

---

[5] Both Dr. Parker and Dr. Parian testified at the first trial but died prior to the retrial in 2014. Using the transcripts from the first trial, the State read their testimony into evidence at the retrial.

At trial, Michael DeLoach testified that, on the morning of the murders, someone broke into his house near Jesup Elementary School and stole several handguns and other items of value, and he reported it to the police the same day. A few days later, Agent Yeomans contacted DeLoach and asked if he would look at evidence the GBI had collected during a murder investigation to see if he recognized any of the items. GBI agents brought the items to DeLoach, and he was able to identify the items found near the Chevy Lumina van as being stolen from his residence on January 8 — namely, (1) a ".22 Magnum semiautomatic" handgun, (2) a .22-caliber clip, (3) a camouflage cooler bag, (4) a ".44 Magnum Ruger," (5) "a high-power 9mm[,]" and (6) .22 Magnum bullets.

During a custodial interview, conducted the day after he was booked into the jail, Jenkins confessed to stealing the firearms and ammunition that belonged to DeLoach and that he used the .22 handgun to kill Terry and Michael Ralston. Jenkins also stated that he discarded a pocketbook he found in the van and agreed to take the GBI agents to the location where he discarded it. The agents

found "a brown pocketbook and an associated clutch purse with the name of — with an identification document in it, including a driver's license of Terry M. Ralston." These custodial statements are at issue in this case.

2. *Jenkins's Claims on Appeal*

Jenkins argues that the trial court erred in admitting his custodial statements, as well as the evidence subsequently recovered — the victim's pocketbook and its contents — at the new trial in 2014. Jenkins argues that (1) the trial court had already suppressed this evidence before the first trial, and the trial court presiding over the new trial lacked authority to revisit that prior ruling; and (2) even if the trial court was authorized to revisit that decision, the trial court erred in concluding that Jenkins's invocation of his right to counsel was invalid because it was anticipatory and occurred before he was actually questioned by law enforcement.

We do not reach the issue of the trial court's authority to revisit its prior ruling because we conclude that the court erred in determining that Jenkins did not validly invoke his *Miranda* rights.

14

Although we conclude that the trial court erred in admitting Jenkins's custodial statements, we do not reach the issue of whether the physical evidence derived from Jenkins's custodial interview was due to be suppressed because that is a separate issue that was not preserved below.[6]

---

[6] Although Jenkins argued at his 2014 trial that the physical evidence was inadmissible as the "fruit of the poisonous tree," without explaining why, the trial court concluded that the evidence was admissible because Jenkins voluntarily and freely participated in the custodial interviews which led to the seizure of that physical evidence. See *Patane v. United States*, 542 U.S. 630, 642-644 (124 SCt 2620, 159 LE2d 667) (2004) (three-Justice plurality concluding that the failure to provide *Miranda* warnings did not require suppression of the physical fruits of the suspect's unwarned but voluntary statements, while noting that suppression would be required if statements were coerced); id. at 644-645 (two Justices agreeing that nontestimonial physical fruits were admissible); see also *Clay v. State*, 290 Ga. 822, 828 (1) (B) (725 SE2d 260) (2012) ("*Patane* held that the suppression of the physical fruits of a defendant's unwarned but voluntary statements is not constitutionally required[.]"). When examining the admissibility of evidence that is contended to be fruit of the poisonous tree, "the appropriate question" is whether the challenged evidence has been obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Teal v. State*, 282 Ga. 319, 323 (2) (647 SE2d 15) (2007) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (83 SCt 407, 9 LE2d 441) (1963); punctuation omitted); see also *State v. Chulpayev*, 296 Ga. 764, 773 (3) (a) (770 SE2d 808) (2015) ("[N]ot all evidence is deemed fruit of a poisonous tree simply because it would not have come to light but for the illegal actions of the police." (citation and punctuation omitted)). This examination depends on the "facts of the case" and the consideration of several factors, but the parties made no argument regarding these factors and the trial court made no ruling on them since it concluded that Jenkins's custodial statements were not illegally obtained, and so there is nothing for us to review on this point. See *Kessler v.*

(a) Before the first trial of this case in 1995, the trial court conducted a *Jackson-Denno*[7] hearing on the admissibility of Jenkins's confession; the relevant part of the hearing took place across two days, March 9, 1995 and March 16, 1995.[8] Testimony from various law enforcement officers showed that when Jenkins

---

*State*, 311 Ga. 607, 613 (3) n.8 (858 SE2d 1) (2021) (issue not raised or ruled upon by the trial court is not preserved for review on appeal).

[7] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[8] The transcripts of these hearings were not included in the record of this appeal, but they are available in our archives in the record associated with Jenkins's first direct appeal in 1998. These transcripts were the only evidence considered by the trial court in 2014, and thus are critical to review that court's decision. Accordingly, we take judicial notice of these transcripts. See *Baez v. Miller*, 266 Ga. 211, 211 (465 SE2d 671) (1996) (a court may take judicial notice of records on file in its own court).

At the March 16, 1995 hearing, the State specifically cited *McNeil v. Wisconsin*, 501 U.S. 171 (111 SCt 2204, 115 LE2d 158) (1991), and argued that a defendant's invocation of the Sixth Amendment right to counsel is insufficient to invoke *Miranda*'s protections. At that hearing, the State's focus was on challenging the credibility of Officer Robinson's testimony, arguing that the trial court should find that Jenkins had not actually stated that he wanted an attorney. The State conceded that, if the Court found that Jenkins made the statement, "all of those items are suppressible." But the 1995 trial court found that Jenkins did invoke *Miranda* in granting the motion to suppress, and the State on retrial did not challenge this factual finding, arguing only that the invocation was anticipatory.

The dissent nevertheless appears to challenge the veracity of Jenkins's statement by pointing out that two officers did not hear Jenkins invoke his right to counsel. But credibility determinations are for the trial court, and the State does not dispute that Jenkins made an unequivocal assertion that he wanted an attorney.

was arrested, Deputy Mullis advised Jenkins of his *Miranda* rights and then took Jenkins to the Wayne County Jail. On the way to the jail, Deputy Mullis and another detective questioned Jenkins, including about the other passengers in the van. At the jail, Deputy Mullis took Jenkins to the booking area and participated in helping search him for weapons. As Officer Robinson patted him down for contraband or weapons, Jenkins stated that he "wasn't answering any questions without his lawyer or without a lawyer." Officer Robinson testified that, despite her limited law enforcement experience, she assumed Jenkins was going to be interviewed.

Two GBI agents went to the jail the next day to interview Jenkins, and prior to the interview, they advised Jenkins of his *Miranda* rights. Jenkins then signed a *Miranda* acknowledgment and waiver form before the agents proceeded with the custodial interview at issue here. Following the *Jackson-Denno* hearing, the trial court entered an order suppressing Jenkins's custodial statements, as well as the recovery of the victim's pocketbook based on information provided to the agents during Jenkins's custodial

17

interview, concluding that Jenkins "unequivocally invoked his right to counsel [to Officer Robinson] when he arrived at the Wayne County Detention Center."

Prior to Jenkins's new trial in 2014, the State filed a "Motion to Admit Into Evidence at Trial Defendant's Post-Arrest Statements to Law Enforcement Officers and Physical Evidence Discovered from Interrogation of the Defendant." The State argued that it was "appropriate" for the trial court to revisit the prior ruling based on the "impact of more recent case law, as well as cases then decided but perhaps not called to the attention of or not considered" by the former trial court, citing *McNeil v. Wisconsin*, 501 U.S. 171 (111 SCt 2204, 115 LE2d 158) (1991), as an example. At a hearing on the issue, the State claimed that it attached as an exhibit to its motion the transcript of the first 1995 hearing.[9] That hearing did not show

---

[9] The State's motion listed several documents that it stated were attached as exhibits; as noted earlier, the record does not appear to contain them and efforts by our clerk's office to obtain them from the trial court were unsuccessful.

18

any reference to *McNeil*. But the State clearly relied upon *McNeil* at the second suppression hearing in 1995.

Following a hearing in September 2014, the trial court ruled that it had the authority to revisit the prior suppression ruling and concluded that Jenkins's custodial statements were admissible at the new trial. In considering the admissibility of the custodial statements, the trial court observed that, although Jenkins invoked his right to counsel during the booking process on January 9, he did not do so before being questioned by GBI agents on January 10. And the trial court concluded that, because *Miranda* rights cannot be invoked anticipatorily in contexts other than custodial interviews and because the booking process is not considered to be a custodial interview "unless there are special circumstances which convert it into an inquiry intended to elicit incriminating statements," Jenkins's statements were admissible at trial. On the facts of this case, we disagree.

(b)   As we have said before,

19

> *Miranda* warnings must be administered to an accused who is in custody and subject to interrogation or its functional equivalent. This requirement arises when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest.

*State v. Walden*, 311 Ga. 389, 389 (858 SE2d 42) (2021) (citations and punctuation omitted); see also *Tolliver v. State*, 273 Ga. 785, 786 (546 SE2d 525) (2001) ("*Miranda* protections adhere when an individual is (1) formally arrested or (2) restrained to the degree associated with a formal arrest." (citing *Stansbury v. California*, 511 U.S. 318 (114 SCt 1526, 128 LE2d 293) (1994)).[10] *Miranda* outlines the procedures to be followed once warnings have been given, making clear that once warnings are given and one of the rights referenced therein is invoked, police must honor that invocation:

---

[10] Although the protections of *Miranda* apply only to custodial interrogations, *Miranda* warnings are often given upon a defendant's arrest because certain questions posed to a suspect in custody even before a formal interrogation could nevertheless be considered a custodial interrogation or the functional equivalent of one. See *State v. Brown*, 287 Ga. 473, 476-477 (2) (697 SE2d 192) (2010) (explaining that "interrogation" is "express questioning by law enforcement officers or its functional equivalent — any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" (citation and punctuation omitted)).

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, *at any time prior to* or during questioning, that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.

*Miranda*, 384 U.S. at 473-474 (emphasis supplied).

No one disputes that Jenkins was in custody for the crimes at issue when he was advised of his *Miranda* rights. And there is no question that some time after that advisement, Jenkins's statement — that he "wasn't answering any questions without his lawyer or without a lawyer" — was a clear and unequivocal assertion that he wanted an attorney.[11] See, e.g., *State v. Brown*, 287 Ga. 473, 476 (2) (697 SE2d 192) (2010) ("I want a lawyer" was an unequivocal assertion of the right to counsel.). The trial court ruled here that Jenkins's invocation was nevertheless invalid because it was "invoked anticipatorily," since he was not being interrogated at the time he made the statement. In support, the trial court cited a

---

[11] In its 2014 order, the trial court noted that the State never challenged Jenkins's statements as being equivocal, and the court found that Jenkins unambiguously invoked his right to counsel.

21

footnote in *McNeil v. Wisconsin*, where the United States Supreme Court noted that "[w]e have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation[.]'" 501 U.S. at 182 n.3.

Construing *McNeil*'s footnote, several federal circuits have held that *Miranda* rights may be invoked only during a custodial interrogation or when an interrogation is imminent. See, e.g., *United States v. Grimes*, 142 F3d 1342, 1348 (11th Cir. 1998); *United States v. LaGrone*, 43 F3d 332, 335-340 (7th Cir. 1994); *Alston v. Redman*, 34 F3d 1237, 1242-1251 (3d Cir. 1994); *United States v. Thompson*, 35 F3d 100, 103-104 (2d Cir. 1994); *United States v. Wright*, 962 F2d 953, 954-956 (9th Cir. 1992). Those cases have each ruled a defendant's invocation invalid due to the circumstances of those invocations, but none of those cases involved circumstances like this case, where a defendant was in custody for the charges at issue, was read his *Miranda* rights, had already been subjected to some custodial interrogation about the charges at issue, was being booked when he invoked, and then unequivocally expressed an

22

intent to avoid answering questions without an attorney's assistance. In *McNeil*, the defendant appeared with counsel at a bail hearing on an armed robbery charge, was questioned by officers about a different crime, and made incriminating statements in response. The defendant argued that counsel's presence at the bail hearing was sufficient to invoke the defendant's *Miranda* rights concerning the unrelated charge. The United States Supreme Court rejected that argument, concluding that the *Edwards* rule required, "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police," and requesting "the assistance of an attorney at a bail hearing does not bear that construction." *McNeil*, 501 U.S. at 175-181 (emphasis omitted) (also rejecting argument because the Sixth Amendment is charge-specific and the invocation of that right as to the charge defendant faced at the time did not extend to the future different charges on which he sought to use it).

In other cases, courts have rejected purported "invocation" claims where the defendant invoked as to charges other than those at issue or was seeking an attorney's help for purposes other than interrogation. See *Grimes*, 142 F3d at 1345, 1347-1350 (rejecting argument that the execution of a "claim of rights" form on an unrelated charge was an effective invocation of *Miranda* rights for "all subsequent purposes"); *LaGrone*, 43 F3d at 337 (a defendant's request to consult his attorney was regarding whether to consent to a search of his property, not about an interrogation, and therefore was not considered an invocation of *Miranda* rights); *Alston*, 34 F3d at 1240-1249 (defendant's execution of a form letter outside the presence of law enforcement that was given to a public defender, after defendant had already been interviewed with no indication that another interview was imminent, was an insufficient invocation); *Thompson*, 35 F3d at 103-104 (defendant's completion of an immigration form was not an invocation because the form contained no request for the assistance of counsel for the purpose of a custodial interrogation); *Wright*, 962 F2d at 954-956 (rejecting

24

claim that defendant's request to have an attorney present for interviews after pleading guilty to state charges was insufficient to invoke *Miranda* rights on unrelated federal offenses).

What can be distilled from these cases is that a defendant cannot be considered to have invoked *Miranda*'s right to counsel simply by bootstrapping from the invocation of some other right, especially when not in custody. But that is not what occurred here. Jenkins made a clear request for an attorney after having been advised of his *Miranda* rights and having already been subjected to some custodial interrogation about the charge at issue. The State relies on the above cases to argue that Jenkins's request was "anticipatory," but none of those cases involve circumstances even remotely similar to the ones present here.

Moreover, the State has not pointed us to any decision in which we have adopted the federal circuit precedent it cites (which, unlike decisions from the United States Supreme Court, is not binding on us), and we have not found any. The closest our decisions appear to have come (largely based on citing *McNeil*) do not involve

25

circumstances resembling anything like the facts of this case. See *Davidson v. State*, 304 Ga. 460, 467 (4) (819 SE2d 452) (2018) (rejecting State's argument that invocation of *Miranda* during interrogation was invalid because invocation preceded *Miranda* warnings); *Green v. State*, 291 Ga. 287, 291-292 (4) (728 SE2d 668) (2012) (holding defendant was not in custody at time of alleged invocation, and invocation of right to counsel was equivocal in any event); *Petty v. State*, 283 Ga. 268, 270 (2) (658 SE2d 599) (2008) (citing *McNeil* for proposition that progeny of *Miranda* does not apply "in a non-custodial situation"). In any event, we need not decide whether these circuit decisions are correct that *Miranda* rights may be invoked only during a custodial interrogation or when an interrogation is imminent, because the State has not carried its burden even under that circuit precedent.

(c) We cannot say that the State proved that interrogation was not at least imminent at the time of Jenkins's invocation, as

viewed from a reasonable person in his position.[12] See *Franks v.*

---

[12] The parties and the 2014 trial court presumed that the booking process, which by its very nature involves law enforcement questioning the defendant, did not itself constitute custodial interrogation. That's not so clear. In the seminal United States Supreme Court decision holding that statements during the booking process were admissible notwithstanding failure to give *Miranda* warnings, five justices took the position that questioning posed during booking was custodial interrogation. See *Pennsylvania v. Muniz*, 496 U.S. 582, 600-602 (110 SCt 2638, 110 LE2d 528) (1990) (four-justice plurality expressly rejected government's argument that "booking questions" did not qualify as custodial interrogation, and instead concluded that the answers to these questions were "nonetheless" admissible despite the failure to provide *Miranda* warnings because the questions fell within the "'routine booking question' exception" to *Miranda*); id. at 608-612 (Marshall, J., concurring in part and dissenting in part) (agreeing booking questions were custodial interrogation but disagreeing with exception allowing admission of their answers). Whether one can properly aggregate those five votes under *Marks v. United States* is unclear. See 430 U.S. 188, 193 (97 SCt 990, 51 LE2d 260) (1977) ("[W]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (citation and punctuation omitted)). One of the five *Muniz* justices to say that booking was custodial interrogation did not concur in the judgment, and the two competing four-justice opinions agreeing that statements during booking were admissible were evenly divided, and it is difficult to say which opinion was narrower. But all five justices to say booking was custodial interrogation concurred in the judgment that one improper question during booking was both custodial interrogation and inadmissible, which may muddy the *Marks* waters a bit. As far as we can tell, no court has ever performed *Marks* analysis on this aspect of *Muniz*. And the most recent court to consider the question concluded that booking is custodial interrogation. See *Compos v. People*, 484 P3d 159, 162-164 (Col. 2021) (relying on the five *Muniz* justices to hold that booking questions constitute custodial interrogation). Our disposition of this case makes it unnecessary to resolve this difficult question.

Our previous cases have recognized that, although requests for basic biographical data generally fall within the *Muniz* booking exception to

27

*State*, 268 Ga. 238, 240 (486 SE2d 594) (1997) ("The focus of whether 'interrogation' occurs is primarily upon the perceptions of the suspect and not the intent of the officer[.]"); see also *Hightower v. State*, 272 Ga. 42, 43 (2) (526 SE2d 836) (2000) (in determining whether a custodial situation exists, the "only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his situation" (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (104 SCt 3138, 82 LE2d 317) (1984))); *State v. Hambly*, 745 NW2d 48, 57 & n.27 (Wis. 2008) (plurality) ("an interrogation is impending or imminent if a reasonable person in the defendant's position would have believed that interrogation was imminent or impending" (citing cases)).[13]

---

*Miranda*, not all questioning during booking falls within this exception and determining whether a reasonable person in the defendant's position believed he was subjected to an interrogation must be done on a case-by-case basis. See *Franks v. State*, 268 Ga. 238, 239-241 (486 SE2d 594) (1997); see also *State v. Nash*, 279 Ga. 646, 649 (3) (619 SE2d 684) (2005) (noting that *Franks* requires scrutiny of booking questions on a case-by-case basis to determine whether those questions were exempt from *Miranda*'s coverage). That said, prior opinions of this Court regarding application of the booking exception must be read in the light of the specific facts of that case.

[13] The federal precedent does not discuss how courts are to assess the imminency of an interrogation in determining whether an invocation is

> When a defendant objects to the admission of statements he made during a police custodial interrogation, the burden is on the State to prove by a preponderance of the evidence that the statement was voluntary and was preceded by the defendant's knowing and voluntary waiver of his *Miranda* rights.

*State v. Nash*, 279 Ga. 646, 649 (3) (619 SE2d 684) (2005); see also *Mack v. State*, 296 Ga. 239, 248 (2) (b) (765 SE2d 896) (2014) (the State has the burden of proving that the defendant initiated contact with the police after invoking his Fifth Amendment right to counsel).

Jenkins, a 17-year-old, was arrested for the crimes at issue. He was read his *Miranda* rights. He was taken to jail, and on the way there, he was briefly questioned by two police officers, including Deputy Mullis. The full nature of the questions he was asked is not clear from the record, but we do know that Jenkins was asked about the other people in the van, which would constitute custodial interrogation. See *Brown*, 287 Ga. at 476 (2) ("interrogation"

---

"anticipatory." But since we are assuming arguendo that this precedent applies, we follow United States Supreme Court precedent governing how courts are to evaluate interactions between police and suspects to determine whether an interaction constituted a custodial interrogation. The dissent cites nothing in support of its criticism of this objective standard.

includes "express questioning by law enforcement officers" (citation and punctuation omitted)).[14] He then arrived at the jail and was subjected to the booking process, which itself involves questions by law enforcement, too.[15] Deputy Mullis, who had advised Jenkins of his *Miranda* rights and had questioned Jenkins previously, was in the booking area. We can see with the benefit of hindsight and expertise in the intricacies of the legal system that those questions were merely routine booking questions, which the United States

---

[14] In addition to the State's erroneous suggestion in its 2014 motion to reconsider that it never relied on *McNeil* in 1995, the State also represented at the hearing on that motion that Jenkins "was not questioned by any law-enforcement officers at any time on January the 9th, 1993 . . . . There was no questions asked whatsoever." But Deputy Mullis testified unequivocally at the March 16, 1995 hearing that Jenkins was questioned on January 9, 1993, and the State never argued in 1995 that was incorrect. The most charitable reading of the State's argument in 2014 was that the State was unfamiliar with the record, including the contents of the transcript of the March 16, 1995 hearing.

[15] Contrary to the dissent's assertion, the record does not show that no "routine booking questions were being asked at the time of the invocation." The record is silent on this point. The witnesses at the relevant hearings were not specifically asked about booking questions, likely because the focus of the hearing was to determine whether Jenkins had invoked his right to counsel, and there was no argument that any questions asked during booking were non-routine. In any case, our case law recognizes that booking generally involves the questioning of a defendant, and no one disputes otherwise. Moreover, the fact that the booking was a multi-stage process is irrelevant to whether a reasonable person would have believed an interrogation was imminent and does not change the fact that Jenkins had already been subjected to custodial interrogation.

Supreme Court has held are an exception to *Miranda*'s prohibition on questioning an unwarned suspect. We also know with the benefit of hindsight that the formal interrogation did not occur until the next day. But we assess all these events through the lens of a reasonable person in Jenkins's position, not through the lens of legal expertise and hindsight. And on these specific facts, we cannot say that such a reasonable person would know that an interrogation was not imminent.[16] Given that Deputy Mullis arrested Jenkins, advised him of his rights, questioned him in the patrol car, and was present in the booking area where Jenkins unequivocally asked for an attorney, a reasonable person in Jenkins's position would have thought the booking process was merely a break in questioning.[17]

---

[16] Our decision here should not be read as holding that a suspect's reasonable expectation of an interview always renders such an interrogation imminent. Such a determination must be based on the facts of each case under the totality of the circumstances. The facts of this case are enough to enable us to reach that conclusion here without having to establish the precise limits of when an interrogation is imminent.

[17] The dissent criticizes this conclusion, suggesting that the interrogation was terminated once Jenkins was taken to the jail and that the protections of *Miranda* are location specific. Our case law clearly recognizes that police often conduct follow-up interrogations, and the dissent cites no authority for the novel idea that *Miranda* protections evaporate once a defendant is moved to a

Accordingly, because Jenkins invoked his *Miranda* rights at a time when a reasonable person would believe interrogation was imminent, his invocation was valid even under the standard that the State argues we should adopt. His invocation was not respected, and his subsequent custodial statements were due to be suppressed. The trial court erred in concluding otherwise.

3. The State argues that any error by the trial court in admitting this evidence was harmless. We disagree.

> When the admission of evidence is an error of constitutional magnitude, it can be harmless error if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming.

*Hill v. State*, 310 Ga. 180, 188-189 (5) (850 SE2d 110) (2020) (citation and punctuation omitted).

---

different location. This suggestion runs counter to the well-accepted principle that, once *Miranda* warnings are given (and thus *Miranda* protections available), police officers are not required to readvise a defendant of his *Miranda* rights during a follow-up interview, even when it occurs in a different location. See *Gaddy v. State*, 311 Ga. 44, 47-48 (2) (855 SE2d 613) (2021). Moreover, the dissent does not contend that the brief interrogation in the vehicle on the way to jail consisted of all the questions the police were interested in asking; the record plainly shows otherwise.

The State makes no claim, and the evidence does not show, that Jenkins's custodial statements were cumulative of other properly admitted evidence. And although the evidence of guilt was substantial, it was not overwhelming. It is true that Jenkins fled from the white van upon seeing a police car, that Jenkins tried to discard the murder weapon as he was being chased, and that Michael's learner's permit was found in one of Jenkins's pockets. But there were no eyewitnesses to the murders, there were three other individuals who fled from the van, and the State points to no physical evidence that Jenkins killed the victims. Although the circumstantial evidence of guilt was strong, we cannot say beyond a reasonable doubt, in a case with facts like these, that the admission of challenged evidence did not contribute to the verdict, particularly when a "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296 (111 SCt 1246, 113 LE2d 302) (1991) (citation and punctuation omitted).

Whatever one may think of *Miranda*,[18] the United States Supreme Court has held that *Miranda* is a decision of federal constitutional law. See *Dickerson v. United States*, 530 U.S. 428, 437-440 (120 SCt 2326, 147 LE2d 405) (2000). Our oath requires us to apply faithfully the decisions of the United States Supreme Court on points of federal law. Nothing in any case that the State cites to us or on which the trial court relied empowers us, on the facts of this case, to disregard the holding of *Miranda* that

> [o]nce warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, *at any time prior to* or during questioning, that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.

*Miranda*, 384 U.S. at 473-474 (emphasis supplied). Jenkins unequivocally said that he would not talk until he had a lawyer. Under the circumstances of this case, *Miranda* requires that Jenkins's custodial statements be suppressed. The trial court erred

---

[18] As we have previously observed, the United States Supreme Court's holding in *Miranda* has no basis in the text, history, or context of the United States Constitution. See *State v. Turnquest*, 305 Ga. 758, 762 (3) (a) (i) & n.4 (827 SE2d 865) (2019).

34

by holding otherwise. That error was harmful, and Jenkins's conviction must be reversed. Because the evidence against him was constitutionally sufficient, he may be retried.

4. Finally, a few words in response to the dissent. The dissent believes that Jenkins's unequivocal invocation of his right to counsel under *Miranda* was invalid because it occurred between custodial interrogations, rather than during custodial interrogation. No legal authority the dissent relies upon supports this unprecedented position.

The dissent does not dispute the fact that Jenkins was advised of his *Miranda* rights upon his arrest for the crimes at issue here. The dissent does not dispute the fact that he was subjected to custodial interrogation on the way to jail. The dissent does not dispute the fact that the law enforcement officer who questioned him on the way to the jail was present for booking, around the time that Jenkins invoked his right to counsel. And the dissent does not grapple with the critical differences between these undisputed facts and the facts of the cases on which it seeks to rely.

Instead, the dissent takes the position that the break in questioning during booking relieved the police officers from following the clear dictates of *Miranda*, as if Jenkins's right to counsel (which clearly existed during the custodial interrogation on the way to the jail) had evaporated once the booking process began. When a defendant invokes *Miranda*'s right to counsel, as Jenkins did here, the *Edwards* rule applies: once the right to counsel is invoked, a suspect in custody has the right "to be free of interrogation until he had consulted with a lawyer" or until the "accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485 (101 SCt 1880, 68 LE2d 378) (1981); see also *Szorcsik v. State*, 303 Ga. 737, 739 (2) (814 SE2d 708) (2018) ("[A]n accused, such as Szorcsik, having expressed his desire to deal with the law enforcement only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him," or if "the accused himself initiates further communication, exchanges, or conversations with the [authorities]."

36

(quoting *Edwards*, 451 U.S. at 485)). Even the trial court in its 2014 order on retrial recognized that *Edwards* would apply if the invocation was valid.

The dissent also criticizes our decision as creating a wholly new standard. But we do no such thing. We merely assume, without deciding, that the "no anticipatory invocation" rule relied on by the State and the trial court is applicable, and conclude that even under that rule Jenkins would prevail.[19] It is that rule, not anything we hold today, that includes the idea that *Miranda*'s right to counsel can be invoked when custodial interrogation is imminent.

For that matter, it is the dissent's proposed rule that is a wholly new standard; the dissent would have us hold for the first time ever that the only time at which *Miranda*'s right to counsel can ever be invoked is during a custodial interrogation. But the only case the dissent cites in support of a no-anticipatory-invocation rule without

---

[19] The dissent gives significant weight to the fact that Jenkins did not testify as to whether he believed an interrogation was imminent. But this is an objective, not subjective test, focusing on whether a reasonable person in Jenkins's position would have believed that.

an imminence component is *Charette v. State of Minnesota*, 980 NW2d 310 (Minn. 2022). The court in that case did not adopt any such rule. While the court there rejected the imminence framework, it also rejected the state's argument that *Miranda* could be invoked only until a question had been asked; the court noted that any such rule was incompatible with *Miranda* itself, which contemplated permissible invocation before interrogation. See *Charette*, 980 NW2d at 318 (citing *Miranda*, 384 U.S. at 470).

In short, the dissent cherry-picks cases from other jurisdictions, all of which apply a standard that neither we nor the United States Supreme Court has ever adopted. The dissent then extracts only the most anti-*Miranda* elements of those cases to propose a novel standard that it does not argue any court in this country has ever adopted or applied. And then it criticizes this majority as doing something "new" when we decline to go along.

Let's be clear: we have found no court in the country that has held a defendant's invocation of *Miranda* was impermissibly anticipatory where the defendant had already been advised of his

rights and been subjected to custodial interrogation about the crime at issue. And the dissent identifies no such case. We decline to be the first.

*Judgment reversed. All the Justices concur, except Ellington, McMillian, LaGrua, and Colvin, JJ., who dissent.*

LAGRUA, Justice, dissenting.

Because Jenkins did not invoke his right to counsel during a custodial interrogation and because there is no legal authority to support the majority opinion's conclusion that a defendant can invoke his *Miranda* rights when "a reasonable person in [the defendant's] position" believes "an interrogation is imminent," I conclude that the trial court did not err in admitting Jenkins's custodial statement at the new trial, and thus, I respectfully dissent.

The record shows that, in January 1993, Jenkins was arrested on suspicion of kidnapping Terry Ralston and her 15-year-old son, Michael, causing Terry's death by shooting her in the back of the head, and killing Michael by shooting him in his left temple. At the

39

time of Jenkins's arrest on January 9, Deputy Mullis, the arresting officer, advised Jenkins of his *Miranda* rights while escorting Jenkins to the patrol car. Deputy Mullis then transported Jenkins to the Wayne County Detention Center, accompanied by Deputy Tony Brinkley and Detective Bill Mosley. On the way to the jail, Detective Mosley asked Jenkins questions "regarding who was in the van" with him, and Jenkins voluntarily told the officers that information. Jenkins did not invoke any of his *Miranda* rights during this questioning.

When Jenkins arrived at the jail at approximately 1:35 p.m., he was brought to Detention Officer Robinson, who "patted him down for contraband or weapons." While Officer Robinson was conducting the pat-down, Jenkins "said that he wasn't answering any questions without his lawyer or without a lawyer." The record does not show that Jenkins made this statement while being subjected to any questioning by Officer Robinson or another officer. In fact, Officer Robinson testified that, after patting Jenkins down and removing his personal property, she placed him in a holding cell

40

and did not bring Jenkins back out to complete "the arrest and booking report with all the information about [Jenkins's] name and social security number and address" until about 20 minutes later at 1:55 p.m. And no evidence was presented to show that, during the completion of the booking report, Officer Robinson asked Jenkins anything other than routine booking questions. See *Franks v. State*, 268 Ga. 238, 239 (486 SE2d 594) (1997).

Jenkins was not interviewed or subjected to any further questioning until 2:55 p.m. the next day, January 10. At that time, GBI agents met with Jenkins to conduct a custodial interview. Before interviewing Jenkins, the GBI agents gave Jenkins his full and complete *Miranda* warnings, and Jenkins explicitly agreed to waive those rights before speaking with the agents, signing the requisite waiver form. Thereafter, Jenkins gave the custodial statement at issue.

> In *Miranda v. Arizona*, the [United State Supreme] Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent

and also the right to the presence of an attorney. The [Supreme] Court also indicated the procedures to be followed subsequent to the warnings. If the accused indicates that he wishes to remain silent, "the interrogation must cease." If he requests counsel, "the interrogation must cease until an attorney is present."

*Edwards v. Arizona,* 451 U.S. 477, 481-482 (II) (101 SCt 1880, 68 LE2d 378) (1981) (citing *Miranda v. Arizona,* 384 U.S. 436, 474, 479 (III) (86 SCt 1602, 16 LE2d 694) (1966)). See also *State v. Pauldo,* 309 Ga. 130, 133 (2) (844 SE2d 829 (2020) ("[When] a suspect [ ] asks for a lawyer at any time during a custodial interrogation[, the suspect] may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation.") (citation and punctuation omitted).

However, "the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to *interrogation." Rhode Island v. Innis,* 446 U.S. 291, 300 (II) (A) (100 SCt 1682, 64 LE2d 297) (1980) (emphasis supplied). In other words,

"in order for the *Miranda* safeguards to take effect, there must first exist custodial interrogation." *Gupta v. State of Maryland*, 156 A3d 785, 801 (B) (Md. 2017) (citation and punctuation omitted).

The United States Supreme Court has defined "interrogation" this way:

"Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself. We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against *coercive police practices*, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have*

*known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 300-302 (II) (A) (citations omitted; emphasis supplied and in original). This Court has similarly held that

> [t]he analysis of what constitutes interrogation is the same whether a suspect invokes the right to remain silent or the right to counsel, because both rights protect the privilege against compulsory self-incrimination by requiring an interrogation to cease when either right is invoked. In this context, interrogation is defined as express questioning by law enforcement officers or its functional equivalent — any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Pauldo*, 309 Ga. at 133-134 (2) (citation and punctuation omitted).

In short, "the inherent compulsion that is brought about by the combination of custody and interrogation is crucial for the attachment of *Miranda* rights." *Gupta*, 156 A3d at 801 (B) (citation and punctuation omitted). See also *Alston v. Redman*, 34 F3d 1237, 1244 (III) (A) (3d Cir. 1994) ("Because the presence of *both* a custodial setting and official interrogation is required to trigger the *Miranda* right-to-counsel prophylactic, absent one or the

44

other, *Miranda* is not implicated."). See also *Illinois v. Perkins*, 496 U.S. 292, 297 (II) (110 SCt 2394, 110 LE2d 243) (1990) ("It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation.").

As noted by the majority opinion and demonstrated by the record, it is uncontested that: (1) Jenkins was fully informed of his *Miranda* rights when he was arrested by Deputy Mullis on January 9; (2) Jenkins was briefly questioned by law enforcement officers while being transported to the jail; and (3) Jenkins was in custody at that time. Accordingly, if this questioning by law enforcement officers constituted an "interrogation," then the record clearly reflects that Jenkins was appropriately advised of his *Miranda* rights. However, the record also reflects that Jenkins did not invoke his *Miranda* rights before or during this questioning, and he responded to the officer's questions voluntarily.

Additionally, the record reflects that Jenkins invoked his *Miranda* right to counsel — i.e., by telling Officer Robinson that he was not answering any questions without an attorney — during a

routine pat-down search by Officer Robinson as she was admitting Jenkins into the jail, *not* during a custodial interrogation.[20] See, e.g., *Charette v. State of Minnesota*, 980 NW2d 310, 317 (Minn. 2022); *Gupta*, 156 A3d at 804 (B); *Alston*, 34 F3d at 1243-1244 (III) (A); *United States v. LaGrone*, 43 F3d 332, 335-340 (7th Cir. 1994). In fact, Officer Robinson testified that she was not questioning Jenkins *at all* when he made this statement, and she did not complete the booking process until about 20 minutes later. And, even if Jenkins had invoked his right to counsel while Officer Robinson was completing the booking process, those routine booking questions "do not qualify as interrogation" and are not subject to *Miranda*. *Pauldo*, 309 Ga. at 135 (2) (noting that "basic biographical questions asked in relation to an arrest are an exception to *Miranda* because such

---

[20] The fact that other law enforcement officers, including the arresting officer and another detention officer, were in the booking area during the pat-down search does not convert this routine search into a custodial interrogation. Additionally, both officers testified that they did not hear Jenkins invoke his right to counsel, and no evidence was offered to refute the officers' testimony. I point this out to support that Jenkins was not undergoing an interrogation at this time, not to question the veracity of Officer Robinson's testimony, as the majority opinion suggests.

'booking' questions are unrelated to the investigation and serve a legitimate administrative need and therefore do not qualify as interrogation") (quoting *Kirby v. State*, 304 Ga. 472, 476 (2) (b) (819 SE2d 468) (2018)). See also *Franks*, 268 Ga. at 239 (holding that "[a] well-established line of federal and state case law has created an exemption from the *Miranda* rule for questions attendant to arrest, because such questions are not related to the investigation of the case, and at the same time[,] serve a legitimate administrative need") (citing Pennsylvania v. *Muniz*, 496 U.S. 582, 601 (110 SCt 2638, 110 LE2d 528 (1990)).

Despite this binding precedent, the majority opinion seems to question whether the booking process should in fact constitute custodial interrogation since, "by its very nature[, it] involves law enforcement questioning the defendant." However, in noting that Jenkins invoked his right to counsel while he was "subjected to the booking process" the majority opinion concedes that "routine booking questions" are "an exception to *Miranda*'s prohibition on

47

questioning an unwarned suspect."[21] The majority opinion further concedes that "formal interrogation did not occur until the next day."

It is not clear why the majority opinion characterizes "booking" here as a "break in questioning," as opposed to characterizing it as an event that occurred after the termination of any prior interrogation — especially given that Jenkins was only questioned in the car on the way to the jail and was not questioned again until the next day. And, in stating that "the *Edwards* rule applies" after Jenkins "invoke[d] *Miranda*'s right to counsel," the majority opinion assumes — without any supporting authority — that a defendant can invoke his *Miranda* right to counsel after an interrogation has occurred in one location, the interrogation has terminated, and the defendant has been moved to a new location where he has not been subjected to any questioning.

The majority opinion ultimately concludes that, "[w]hether or not the booking process itself was custodial interrogation, the facts

---

[21] There is no evidence in the record suggesting that "routine booking questions" were being asked at the time of the invocation.

of this case show that a reasonable person in Jenkins's position would have believed that interrogation was at least imminent,"[22] and "because Jenkins invoked his *Miranda* rights at a time when a reasonable person would believe interrogation was imminent, his invocation was valid." The majority opinion does not adequately explain why a reasonable person in Jenkins's position would believe interrogation was imminent. And it is unclear to me why, as a general matter, a reasonable person *who had already been interrogated* and was then moved to a new location and was booked into jail by a different officer would believe that interrogation would occur *again* imminently after booking. Even more concerning to me is that, in reaching this conclusion, the majority opinion announces a new legal standard — one which requires the State to prove that "interrogation was not at least imminent at the time of [a defendant's] invocation, as viewed from a reasonable person in his

---

[22] Jenkins did not testify at any of his motion to suppress hearings in 1995, so we cannot affirmatively say that Jenkins believed that a custodial interview was "imminent" at the time of his invocation. See *United States v. Grimes*, 142 F3d 1342, 1348 (II) (C) (2) (11th Cir. 1998).

position," and one which requires this Court "to assess" the facts of the case "through the lens of a reasonable person in Jenkins's position" to determine whether "a reasonable person would know that interrogation was [or was] not imminent."

In this respect, what the majority opinion creates is not the "no anticipatory invocation" rule, but rather a reasonable-person standard for determining whether interrogation is imminent — a standard for which the majority opinion cites no supporting legal authority. "[T]he U.S. Supreme Court has never held that a suspect can invoke their Fifth Amendment right to counsel when interrogation is imminent." *Charette*, 980 NW2d at 317. The legal concept of whether a custodial interrogation is "imminent" appears to arise primarily from the United States Supreme Court's decision in *McNeil*, where the Supreme Court noted that "[w]e have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation[.]'" *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (111 SCt 2204, 115 LE2d 158) (1991). "Some federal and state courts" have since interpreted

50

this decision to mean "that defendants can invoke their Fifth Amendment rights when interrogation is 'imminent,'" without defining the term or providing direction as to when an interrogation is considered "imminent." *Charette*, 980 NW2d at 316 (citing *United States v. Grimes*, 142 F3d 1342, 1348 (II) (C) (2) (11th Cir. 1998); *LaGrone*, 43 F3d at 335-340; *Ault v. State of Florida*, 866 S2d 674 (Fla. 2003); *State of Kansas v. Appleby*, 221 P3d 525, 548 (E) (Kan. 2009); *Gupta*, 156 A3d at 791 (B)). To that end, the Eleventh Circuit Court of Appeals has held that "*Miranda* rights may be invoked only during custodial interrogation or when interrogation is imminent," but did not cite a standard for determining when an interrogation is "imminent." *Grimes*, 142 F3d at 1348 (II) (C) (2).

Moreover, the majority opinion does not cite any case in which another court has concluded that the interrogation was imminent under the circumstances of this case. Instead, the majority opinion exclusively relies on cases in which courts have held that the interrogation was not imminent and reasons that, because the circumstances of this case are different, the opposite must be true,

51

and the interrogation here must be considered imminent. See, e.g., *Grimes*, 142 F3d at 1348 (II) (C) (2); *LaGrone*, 43 F3d at 335-340; *Alston*, 34 F3d at 1242-1251 (III); *United States v. Thompson*, 35 F3d 100, 103-104 (1) (2d Cir. 1994); *United States v.Wright*, 962 F2d 953, 954-956 (9th Cir. 1992). But none of those cases stand for that proposition.

In addition, this Court has never expressly adopted an "imminent interrogation" rule, nor do I think we should do so now. *Charette*, 980 NW2d at 317.[23] And, the conclusion I reach here falls squarely within the scope of the *Miranda* principles clearly set forth

---

[23] In *Charette*, the Supreme Court of Minnesota persuasively held:

The "imminent interrogation" rule poses serious practical difficulties that we must consider before adopting it as the law of Minnesota. Without defining when an interrogation becomes imminent, it will be difficult for a law enforcement officer to make that determination, particularly in evolving situations where the intent to interrogate may change based on the suspect's behavior (like here), the available evidence, or other circumstances, like the availability of holding cells or interview rooms. We also question whether "imminence" might dissipate based on signals from law enforcement that they no longer intend to interrogate a person and how this affects the ability to invoke the Fifth Amendment right to counsel. This lack of clarity is contrary to the Supreme Court's preference for "bright-line rules" in the *Miranda* context. . . . Accordingly, under the facts of this case, we are not inclined to fashion such a rule when the Supreme Court has not yet done so.

Id.

by the United States Supreme Court, whereas the majority opinion extrapolates from those principles in an unprecedented way. No federal or state court has established the imminence standard espoused by the majority opinion here — i.e., whether a "reasonable person in [the defendant's] position" believes "an interrogation is imminent." And, although the majority opinion claims that it is merely assuming without deciding that the "imminent interrogation" rule applies, id., it is difficult to discern how the majority is not adopting that rule as the law in this State when the majority is applying it to reverse these double murder convictions.

Accordingly, I conclude that, because Jenkins was not being "interrogated within the meaning of *Miranda*" at the time he invoked his right to counsel, his invocation of the right to counsel under *Miranda* was not effective. *Innis*, 446 U.S. at 302 (II) (B). And, because *Miranda* did not apply, the GBI agents' questioning of Jenkins on January 10 — after fully advising him of his *Miranda* rights and receiving a voluntary waiver thereof — was permissible,

53

and Jenkins's custodial statement was admissible against him at the new trial.

Additionally, I note that Jenkins also argues on appeal that the trial court presiding over his new trial lacked authority to revisit the exclusion of Jenkins's custodial statement at the first trial because the trial court's "inherent power" to revoke that interlocutory ruling "cease[d] with the end of the term" in which the suppression order was entered. *Moon v. State*, 287 Ga. 304, 304 (696 SE2d 55) (2010). I believe that the trial court was authorized to admit this evidence on a new motion by the State after a new trial was ordered.

The end-of-term rule "comes from the pre-Revolution English common law." *Moon*, 287 Ga. at 305 (1) (Nahmias, J., concurring).

> At common law, the rule for both final and interlocutory orders, in both civil and criminal cases, and in both Georgia and federal courts, was that the trial court's inherent authority to reconsider the order expired at the end of the term of court in which the order was entered. The rules in this area reflect a balance between the need for *finality* of judicial decisions and the understanding that trial courts should have the opportunity to reach the *correct* decisions.

54

Id. at 305-306 (1) (Nahmias, J., concurring) (citations omitted; emphasis in original). This common law rule has remained largely unchanged with respect to final judgments in civil and criminal cases. See id. at 306 (1). In both civil and criminal cases, where "the entire case or relevant portion is deemed concluded by final judgment, the trial court cannot reconsider the issues after a short period (like the end of the term) unless the case is successfully appealed," or in the criminal context, challenged in a habeas proceeding. Id.

But "[i]nterlocutory rulings are different." *Moon*, 287 Ga. at 306 (1) (Nahmias, J., concurring). "[T]he Civil Practice Act reformed many common law rules for civil cases, including eliminating the end-of-term rule with respect to interlocutory rulings[.]" Id. at 307 (Nahmias, J., concurring). And so, "[i]n civil cases, an interlocutory ruling does not pass from the control of the court at the end of the term if the cause remains pending." *Kelly v. State*, 315 Ga. 444, 447 (2) (883 SE2d 363) (2023) (citation and punctuation omitted). "In criminal cases, however, 'a trial court's inherent power to revoke

interlocutory rulings [still] ceases with the end of the term,' unless a motion for reconsideration is filed during the same term as the ruling at issue." Id. (quoting *Moon*, 287 Ga. at 304). In other words, "in a criminal case, a trial court generally loses its inherent power to revise, correct, revoke, modify, or vacate its judgment at the end of the term of court in which it renders that judgment." Id.

But the end-of-term rule does not apply in this case. After Jenkins was convicted in the first trial, he successfully challenged his convictions in a habeas proceeding, and the habeas court vacated Jenkins's convictions and ordered a new trial. This Court then affirmed the judgment of the habeas court ordering a new trial. See *Terry v. Jenkins*, 280 Ga. 341 (627 SE2d 7) (2006).

"When [an] appellant [i]s granted a new trial, it wipe[s] the slate clean as if no previous conviction and sentence had existed." *Salisbury v. Grimes*, 223 Ga. 776, 778 (2) (158 SE2d 412) (1967). And, pursuant to OCGA § 5-5-48, "when a new trial has been granted by the court, the case shall be placed on the docket for trial *as though no trial had been had*[.]" *State v. Hamilton*, 308 Ga. 116,

56

119-120 (2) (839 SE2d 560) (2020) (emphasis in original) (citing *Bankhead v. State*, 253 Ga. App. 214, 215 (1) (558 SE2d 407) (2001) (holding that "[w]here a new trial has been granted, the case stands ready for trial as if there had been no trial[,]" and "[t]he effect of the grant of a new trial by an appellate court is to require the case to be heard de novo unless specific direction be given in regard thereto")). In essence, "the grant of a new trial has the effect of setting aside all proceedings in the old trial." *Trauth v. State*, 295 Ga. 874, 876 (1) (763 SE2d 854) (2014) (citation and punctuation omitted). "[A] reversal by this Court sets aside the prior trial court proceedings and requires the case to be heard again," and in that situation, the trial court is not "required to rehear all pretrial motions as though they had never before been considered," but it is not prohibited from doing so. *Smith v. State*, 292 Ga. 620, 622 (3) (740 SE2d 158) (2013). "The effect of [the] new trial grant is to leave the cause pending in the lower court." *Pledger v. State*, 193 Ga. App. 588, 589 (2) (a) (388 SE2d 425) (1989). "It follows from this principle that, upon the grant of a new trial, the trial court has the authority to reconsider any of

57

its previous rulings that have not been adjudicated on appeal." *Smith*, 292 Ga. at 622 (3) (citing *Ritter v. State*, 272 Ga. 551, 553 (2) & n.4 (532 SE2d 692 (2000) (noting that the admissibility of the defendant's statement had not been considered or ruled upon by this Court on appeal)).

Here, the State filed a new motion to admit post-arrest evidence, which the trial court was authorized to consider, and the end-of-term rule does not prohibit the trial court from ruling on new motions filed upon the new trial of the case, even if the subject matter was ruled upon previously. See *Smith*, 292 Ga. at 622 (3). See also *Trauth*, 295 Ga. at 876 (1). For these reasons, I believe that the trial court did not err in considering the State's new motion to admit Jenkins's January 10 custodial statement at the new trial, see *Smith*, 292 Ga. at 622 (3), and I would affirm the judgment of the trial court.

I am authorized to state that Justice Ellington, Justice McMillian, and Justice Colvin join in this dissent.

Decided November 2, 2023.

Murder. Glynn Superior Court. Before Judge Scarlett.

*Robert L. Persse*, for appellant.

*Keith Higgins, District Attorney, Benjamin E. Gephardt, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.